## Court of Appeals.

*June*, 1885.

## PEOPLE *v.* MARX.

(Reversing 3 *N. Y. Crim. Rep.* 11.)

CONSTITUTIONAL LAW.—OLEOMARGARINE ACT (L. 1884, CH. 202).

The prohibition contained in "An Act to prevent deception in the sale of dairy products," *L.* 1884, ch. 202 ("The Oleomargarine Act"), is absolute against the manufacture and sale of the articles therein specified.

The statutory prohibition of the imitation of dairy products contained in *L.* 1882, chs. 215, 238, and 246, is not repealed by *L.* 1884, ch. 202.

The constitutional right to "*liberty*" (State Constitution, art. I. § 6) includes not only freedom from physical restraint, but the right of a a citizen to adopt and follow any calling or pursuit not injurious to the community, as he may see fit, subject only to such restraints as may be necessary for the general welfare.

An enactment which absolutely prohibits an important branch of industry for the sole reason that it competes with others, is unconstitutional because in violation of the provisions of the state Constitution (art. 1. §§ 1, 6) and of the fourteenth amendment of the Constitution of the United States.

"The Oleomargarine Act" is unconstitutional.

APPEAL from a judgment of the General Term of the Supreme court, in the First Department, of January, 1885, affirming a judgment of the court of General Sessions of New York

convicting defendant of a violation of "An Act to prevent deception in the sale of dairy products," *L.* 1884, ch. 202.

The decision at General Term, reported *ante*, p. 11, contains a statement of the facts.

*F. R. Coudert* and *Wheeler H. Peckham,* for defendant, appellant.

*Randolph B. Martine,* district attorney (*De Lancey Nicoll,* assistant) for the people, respondent.

RAPALLO, J.—The defendant was convicted in the court of General Sessions of the city and county of New York, of a violation of the sixth section of an act entitled "An Act to prevent deception in sales of dairy products" (chap. 202 of the Laws of 1884). On appeal to the General Term of the Supreme court in the First Department, the conviction was affirmed, and the defendant now appeals to this court from the judgment of affirmance.

The main ground of the appeal is that the section in question is unconstitutional and void.

The section provides as follows : " § 6. No person shall manufacture out of any oleaginous substances, or any compound of the same, other than that produced from unadulterated milk, or of cream from the same, any article designed to take the place of butter or cheese produced from pure unadulterated milk or cream of the same, or shall sell or offer to sell the same as an article of food. This provision shall not apply to pure skim milk cheese, produced from pure skim milk."

The rest of the section subjects to heavy punishments by fine and imprisonment "whoever violates the provisions of this section."

The indictment charged the defendant with having, on October 31, 1884, at the city of New York, sold one pound of a certain article manufactured out of divers oleaginous substances and compounds thereof, other than those produced from unadulterated milk, to one J. M., as an article of food, the article so sold being designed to take the place of butter produced from pure unadulterated milk or cream. It is not charged

that the article so sold was represented to be butter, or was sold as such, or that there was any intent to deceive or defraud, or that the article was in any respect unwholesome or deleterious, but simply that it was an article designed to take the place of butter made from pure milk or cream.

On the trial, the prosecution proved the sale by the defendant of the article known as oleomargarine, or oleomargarine butter. That it was sold at about half the price of ordinary dairy butter. The purchaser testified that the sale was made at a kind of factory, having on the outside a large sign " oleomargarine"; that he knew he could not get butter there, but knew that oleomargarine was sold there. And the district-attorney stated that it would not be claimed that there was any fraudulent intent on the part of the defendant, but that the whole claim on the part of the prosecution was, that the sale of oleomargarine as a substitute for dairy butter was prohibited by the statute. On the part of the defendant, it was proved by distinguished chemists that oleomargarine was composed of the same elements as dairy butter; that the only difference between them was that it contained a smaller proportion of a fatty substance known as buttyrine; that this buttyrine exists in dairy butter only in a small porportion—from three to six per cent; that it exists in no other substance than butter made from milk, and is introduced into oleomargarine butter by adding to the oleomargarine stock some milk, cream or butter, and churning, and when this is done, it has all the elements of natural butter, but there must always be a smaller percentage of buttyrine in the manufactured product than in butter made from milk; the only effect of the buttyrine is to give flavor to the butter, and has nothing to do with its whole someness; that the oleaginous substances in the oleomargarine are substantially identical with those produced from milk or cream. Professor Chandler testified that the only difference between the two articles was that dairy butter had more buttyrine; that oleomargarine contained not over one per cent. of that substance, while dairy butter might contain four or five per cent., and that if four or five per cent. of buttyrine were added to the oleomargarine, there would be no difference, it would be butter; irrespective of the sources, they would be the

same substances. According to the testimony of Professor Morton, whose statement was not controverted or questioned, oleomargarine, so far from being an article devised for purposes of deception in trade, was devised in 1872, or 1873, by an eminent French scientist who had been employed by the French government to devise a substitute for butter.

Further testimony as to the character of the article being offered, the district-attorney announced that he did not propose to controvert that already given. Testimony having been given to the effect that oleomargarine butter was precisely as wholesome as dairy butter, it was, on motion of the district-attorney, stricken out, and the defendant's counsel excepted. The broad ground was taken at the trial, and boldly maintained on the argument of this appeal, that the manufacture or sale of any oleaginous compound, however pure and wholesome as an article of food, if it is designed to take the place of dairy butter, is by this act made a crime. The result of the argument is, that if in the progress of science a process is discovered of preparing beef tallow, lard, or any other oleaginous substance, and communicating to it a palatable flavor so as to render it serviceable as a substitute for dairy butter, and equally nutritious and valuable, and the article can be produced at a comparatively small cost, which will place it within the reach of those who cannot afford to buy dairy butter, the ban of this statute is upon it. Whoever engages in the business of manufacturing or selling the prohibited product is guilty of a crime ; the industry must be suppressed ; those who could make a livelihood by it are deprived of that privilege. The capital invested in the business must be sacrificed, and such of the people of the state as cannot afford to buy dairy butter must eat their bread unbuttered.

The references which have been here made to the testimony on the trial, are not with the view of instituting any comparison between the relative merits of oleomargarine and dairy butter, but rather as illustrative of the character and effect of the statute whose validity is in question. The indictment upon which the defendant was convicted does not mention oleomargarine, neither does the section (§ 6) of the statute although the article is mentioned in other statutes which will

be referred to. All the witnesses who have testified as to tne qualities of oleomargarine may be in error; still, that would not change a particle the nature of the question, or the principles by which the validity of the act is to be tested. Section 6 is broad enough in its terms to embrace not only oleomargarine, but any other compound, however wholesome, valuable or cheap, which has been or may be discovered or devised for the purpose of being used as a substitute for butter. Every such product is rigidly excluded from manufacture or sale in this state.

One of the learned judges who delivered opinions at the General Term, endeavored to sustain the act on the ground that it was intended to prohibit the sale of any artificial compound as butter or cheese made from unadulterated milk or cream. That it was that design to deceive which the law rendered criminal. If that were a correct interpretation of the act, we should concur with the learned judge in his conclusion as to its validity; but we could not concur in his further view that such an offense was charged in the indictment, or proved upon the trial. The express concessions of the prosecuting officer are to the contrary. We do not think that section 6 is capable of the construction claimed. The prohibition is not of the manufacture or sale of an article designed as an *imitation* of dairy butter or cheese, or intended to be passed off as such, but of an article designed to *take the place of* dairy butter or cheese. The artificial product might be green, red or white, instead of yellow, and totally dissimilar in appearance to ordinary dairy butter, yet it might be designed as a substitute for butter, and if so, would fall within the prohibition of the statute. *Simulation* of butter is not the act prohibited. There are other statutory provisions fully covering that subject. Chapter 215, of the Laws of 1882, entitled, "An Act to regulate the manufacture and sale of oleomargarine, or any form of imitation butter and lard, or any form of imitation cheese, for the prevention of fraud, and the better protection of the public health," by its first section prohibits the introduction of any substance into imitation butter or cheese for the purpose of imparting thereto a color resembling that of yellow butter or cheese. The second section prohibits the sale of oleomargarine or imitation butter

thus colored, and the third section prohibits the sale of any article in semblance of natural cheese, not the legitimate product of the dairy, unless plainly marked "imitation cheese." Chapter 238 of the Laws of 1882, is entitled " An Act for the protection of dairymen, and to prevent deception in the sales of butter and cheese," and provides (§ 1) that every person who shall manufacture for sale, or offer for sale or export any article in semblance of butter or cheese, not the legitimate product of the dairy, must distinctly and durably stamp on the side of every cheese, and on the top and side of every tub, firkin, or package, the words " oleomargarine butter," or if containing cheese, " imitation cheese ;" and chapter 246 of the Laws of 1882, entitled " An Act to prevent fraud in the sale of oleomargarine, butterine, suine, or other substance not butter," makes it a misdemeanor to sell at wholesale or retail, any of the above articles, representing them to be butter.

These enactments seem to cover the entire subject of fraudulent imitations of butter, and of sales of other compounds as dairy products, and they are not repealed by the act of 1884, although that act contains an express repeal of nine other statutes, eight of which are directed against impure or adulterated dairy products, and one against the use of certain coloring matter in oleomargarine.

The provisions of this last act are covered by one of the acts of 1882, above cited, and the provisions of the repealed acts in relation to dairy products are covered by substituted provisions in the act of 1884, but the statutes directed against fraudulent simulations of butter, and the sale of any such simulations as dairy butter, are left to stand. Further statutes to the same effect were enacted in 1885. Consequently, if the provisions of section 6 should be held invalid, there would still be ample protection in the statutes against fraudulent imitations of dairy butter, or sales of such imitations as genuine.

It appears to us quite clear, that the object and effect of the enactment under consideration was not to supplement the existing provisions against fraud and deception by means of imitations of dairy butter, but to take a further and bolder step, and by absolutely prohibiting the manufacture or sale of any article which could be used as a substitute for it, however

openly and fairly the character of the substitute might be avowed and published, to drive the substituted article from the market, and protect those engaged in the manufacture of dairy products against the competition of cheaper substances, capable of being applied to the same uses as articles of food.

The learned counsel for the respondent frankly meets this view, and claims in his points, as he did orally upon the argument, that even if it were certain that the sole object of the enactment was to protect the dairy industry in this state against the substitution of a cheaper article made from cheaper materials, this would not be beyond the power of the legislature.

This, we think, is the real question presented in the case. Conceding that the only limits upon the legislative power of the state are those imposed by the state Constitution and that of the United States, we are called upon to determine whether or not those limits are transgressed by an enactment of this description. These limitations upon legislative power are necessarily very general in their terms, but are at the same time very comprehensive. The Constitution of the state provides (art. 1, § 1), that no member of this state shall be disfranchised, or deprived of any of the rights and privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers. Section 6 of article 1 provides that no person shall be deprived of life, liberty or property, without due process of law. And the fourteenth amendment to the Constitution of the United States provides that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." These constitutional safeguards have been so thoroughly discussed in recent cases that it would be superfluous to do more than refer to the conclusions which have been reached bearing upon the question now under consideration. Among these, no proposition is now more firmly settled than that it is one of the fundamental rights and privileges of every American citizen to adopt and follow such lawful industrial pursuit, not injurious

to the community, as he may see fit. Live Stock Association *v.* Crescent City, &c., 1 *Abb. U. S.* 398 ; 16 *Wall.* 106 ; Corfield *v.* Coryell, 4 *Wash. C. Ct.* 380 ; Matter of Jacobs, 98 *N. Y.* 98 ; 2 *N. Y. Crim. Rep.* 539. The term " liberty," as protected by the Constitution, is not cramped into a mere freedom from physical restraint of the person of the citizen, as by incarceration, but is deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. In the language of ANDREWS, J., in Bertholf *v.* O'Reilly (74 *N. Y.* 515), the right to liberty embraces the right of man " to exercise his faculties and to follow a lawful avocation for the support of life ;" and as expressed by EARL, J., in *In re* Jacobs, " One may be deprived of his liberty, and his constitutional right thereto violated, without the actual restraint of his person. Liberty, in its broad sense, as understood in this country, means the right not only of freedom from servitude, imprisonment or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation."

Who will have the temerity to say that these constitutional principles are not violated by an enactment which absolutely prohibits an important branch of industry for the sole reason that it competes with another, and may reduce the price of an article of food for the human race ?

Measures of this kind are dangerous even to their promoters. If the argument of the respondent in support of the absolute power of the Legislature to prohibit one branch of industry for the purpose of protecting another with which it competes, can be sustained, why could not the oleomargarine manufacturers, should they obtain sufficient power to influence or control the legislative councils, prohibit the manufacture or sale of dairy products ? Would arguments then be found wanting to demonstrate the invalidity under the Constitution of such an act ? The principle is the same in both cases. The numbers engaged upon each side of the controversy cannot influence the question here. Equal rights to all are what are intended to be

secured by the establishment of constitutional limits to legislative power, and impartial tribunals to enforce them.

Illustrations might be indefinitely multiplied of the evils which would result from legislation which should exclude one class of citizens from industries, lawful in other respects, in order to protect another class against competition. We cannot doubt that such legislation is violative of the letter as well as of the spirit of the constitutional provisions before referred to, nor that such is the character of the enactment under which the appellant was convicted.

The judgment of the general term and of the court of Sessions should be reversed.

All concur.