## Court of Appeals.

*October* 1886.

### PEOPLE v. ARENSBERG.

(REVERSING 4 N. Y., CRIM. REP. 401.)

### OLEOMARGARINE LAWS 1885, CHAP. 458 § 7.

Upon the trial of a defendant for manufacturing an article in imitation of butter, the guilt of the defendant does not depend upon the simple manufacture and sale of the article, but upon the further question whether the article was manufactured in imitation or semblance of butter.

APPEAL by defendant, Lippman Arensberg, from a judgment of the General Term of the Supreme Court in the Second Department, affirming a judgment of the Court of Sessions of Kings county, affirming a conviction of defendant of selling oleomargarine in imitation of butter.

The facts sufficiently appear in the opinion.

*F. R. Coudert* and *W. H. Peckham*, for the defendant, appellants.

*Edward B. Thomas* and *W. P. Quinn*, for the People, respondents.

FINCH, J.—The record discloses an error in the charge of the trial judge to the jury. He submitted to them the bare

question whether the defendant had manufactured or sold oleomargarine not made from milk or cream, and charged that if he did he was guilty under the law. The language of the court was especially clear and decisive. The jury were told: "If you believe that the defendant did sell this article called oleomargarine, and that it was not a producttion of pure, unadulterated milk, or cream of the same, then he committed an offense under the law. The simple question for you to decide is, did this defendant or did he not sell an article known as oleomargarine, and was that article made of pure, unadulterated milk and cream? If he did so sell that article, and if it was not so made, he is guilty of a violation of this statute."

It would be difficult to make the direction plainer. But the guilt of the prisoner did not and could not lie in the simple manufacture and sale of the article, and depended upon the further inquiry whether it was manufactured in imitation or semblance of butter; whether, by the use of ingredients not necessary or essential to the article itself, it was sought to accomplish such imitation or resemblance. The proof showed that when oleomargarine was put upon the market in its normal condition, and before the addition of ingredients designed to modify its natural tastes and color, it was of a pearl-white hue, resembling tallow, but that coloring matter was sometimes added. It was to prevent such or similar imitations that the act of 1885 was framed. Section 7 forbids two things: the manufacture, not from milk or cream, of an article or product in imitation or semblance of butter, or designed to take the place of butter. The latter clause is ineffectual, as we held in the *Marx Case* (99 N. Y., 377; 3 N.Y., Crim. 200). It was under the first alone that the defendant could be convicted, and yet the charge of the court ignored this element of offense entirely, and missed the precise point of the accusation. Whether the oleomargarine manufactured by the defendant was or was not an imitation or semblance of butter became the material inquiry, but was withheld from the jury, and they were instructed to convict upon proof of the manufact-

ure and sale of the article known as oleomargarine. Practically that was a ruling, as matter of law, that the article thus known is an imitation of butter, whereas it may or may not be ; and the question whether, in a given case, it is or is not, is one for the jury. A sample of the product manufactured by the defendant was produced before them, and open to their observation. The vital point of the alleged crime is the manufacture and sale of an article which is an imitation and semblance of butter, and so is calculated to deceive, and indicates a deceptive purpose, immediate or ultimate ; and that is a question of fact which the court was not authorized to determine as a matter of law, but, upon the evidence produced, should have submitted to the jury.

It is said that the imitation was admitted, and the case tried on that assumption. I am unable to agree in that proposition. I do not think the imitation was conceded, and a distinct exception was taken to the charge, which ignored the fact of imitation as essential to the crime, and argued before us on the appeal.

For this error, without considering the constitutional question, the judgment should be reversed, and a new trial ordered.

RUGER, C. J., and RAPALLO and DANFORTH, JJ., concur.

ANDREWS, J.—Dissents on the ground that it was proved and assumed on the trial that coloring matter had been added to the substance called " oleomargarine " to give it a yellow color resembling natural butter, and that the sale of oleomargaine, so colored, constitutes an offense under the act, within the competency of the legislature to declare.

EARL, J., (dissenting).—The defendant was indicted and convicted for selling oleomargarine at the city of Brooklyn, in this state, in violation of section 7 of chapter 183 of the Laws of 1885, as amended by chapter 458 of the same year. Upon the trial, a witness, who described himself as a state dairy expert, testified as follows : That the defendant was

engaged in the business of manufacturing oleomargarine; that on the 16th day of July, he bought of him personally three tubs of oleomargarine; that he asked for oleomargarine, and bought it as such; and that he subsequently delivered a sample of it to Mr. Gladding, who was also called as a witness, and testified that he was a chemist; that the sample delivered to him by the previous witness was of a yellow color, resembling butter; that it was composed of animal fat, or animal or vegetable oil, not produced from unadulterated cream; that he did not know the particular substance used to give it color, but that a coloring substance had been used; that he was acquainted with oleomargarine and its ingredients, and that in its pure manufacture it has a dull, pearl-white color, resembling tallow. On his cross-examination he testified that the article was probably made of tallow or of lard, or of a mixture of both, and that it was composed of the same things as are found in milk, except that in milk they are combined with other things and in different proportions; that it contained all the ingredients found in pure butter, but in different proportions, and differently combined. Another witness, a chemist, called on the part of the people, gave similar evidence.

When the defendant began to call his witnesses, the trial judge announced that he would hold that any affirmative testimony on his part as to the qualities of oleomargarine or its constituent parts was inadmissible, unless he proposed to show that it was made from pure, unadulterated milk or cream. The defendant called an expert chemist, and asked him, "What is the difference between oleomargarine and butter, if any?" The plaintiff objected to this, and, on the admission of defendant's counsel that he did not pretend that the article sold by the defendant was made of unadulterated milk or cream, the judge again stated that he should exclude all affirmative testimony on the part of the defendant as to the constituents of the oleomargarine, as to its manufacture and healthfulness or otherwise, and he excluded the question. The witness was then asked to look at the sample

of oleomargarine produced by the plaintiffs and state " wheth-er it is not butter." This was objected to by the plaintiff and excluded. The following questions were then put to the same witness, and all, on the objection of plaintiff's counsel, were excluded : " Look at that [Gladding's analysis of the specimen of oleomargarine], and state whether or not the in-gredients which go to make up that compound are not, in themselves separately, and in the compound, wholesome articles of food." " State whether an article made of these separate ingredients would or would not constitute a health-ful and cleanly article of food." " You have stated that the article we have spoken of as oleomargarine had been invented by a Frenchman in 1870 or 1871. Will you state, if you please, whether, since that time, this article has been used extensively all over the world as an article of food ? " " Will you state whether there is or is not in this composition any-thing which is not found in butter ? " " Is there anything in butter which is not found in this article ? " The same questions were also put to Prof. Chandler, an expert chemist, and excluded. The defendant was sworn as a witness on his own behalf, and testified that he had been in the oleomar-garine business for about five years; that there was a large sign, with the word " Oleomargarine " thereon, on the out-side of his place of business, and that he had there machinery and property employed in that business. He was then asked the following questions, which, on the objection of plaintiffs' counsel, were excluded : " What was the value of that ma-chinery and property on the 30th day of April, 1885 ? " " What would be the value of that machinery and property in case you were not allowed to use it in the manufacture of oleomargarine ? " He then offered to prove that the article in question is " a form of butter made otherwise than by the natural process." Plaintiff's counsel objected to this on the ground that " the offer is not to prove that the product is made from substances other than those prohibited by section 7 of the statute," and the evidence was excluded.

The counsel for the defendant requested the judge to direct

the jury to acquit him, on the ground that the statute under which he was indicted was unconstitutional, and also on the ground that the statute was aimed only at fraud, and that here there was no evidence of any fraud. The judge denied the request, and then charged the jury " that this is a valid and constitutional law; that, if you believe that the defenddant did sell this article called ' oleomargarine,' and that it was not a production of pure, unadulterated milk, or cream of the same, then he committed an offense under the law. The simple question for you to decide is, did this defendant or did he not sell an article known as oleomargarine ? and was that article made of pure, unadulterated milk, or cream of the same ? If he did so sell that article, and if it was not so made, he is guilty of the violation of this statute, which I again charge you is a valid and constitutional law." Proper exceptions were taken to this portion of the charge, and to all the rulings against him. The jury found him guilty; and his conviction having been affirmed at the general term, he appealed to this court.

Besides the general statutes prohibiting the adulteration of food, there has been in this state for several years stringent and special enactments prohibiting the sale of unwholesome and deceptive dairy products. The legislature has attempted to keep pace with the devices of men to circumvent its policy. By the act, chapter 415 of the Laws of 1877, it first undertook to deal with oleomargarine, which a short time before had first made its appearance in this country. By section 1 it was provided that every person who should manufacture for sale, or offer or expose for sale any article in semblance of butter, not the legitimate product of the dairy, and not made exclusively of milk or cream, but with which the oil or fat of animals entered as a component part, should distinctly and durably stamp or brand upon every tub or package of such article the word " Oleomargarine; " and that, in case of retail sale of such article in parcels, the seller should in all cases deliver therewith to the purchaser a written or printed label, bearing the plainly written or printed word " Oleomargarine; " and it

was declared that every sale of such article or substance not so stamped or branded should be unlawful, and that no action should be maintained to recover the price thereof. Sections 2 and 3 provided that every person who should knowingly sell or offer to sell any of such articles required by the first section to be stamped or branded, not so stamped or branded, should, for each and every offense, forfeit and pay a fine of $100, and be guilty of a misdemeanor. All the sections of that act were amended by the act, chapter 439, Laws 1880, making them more explicit and stringent, particularly as to stamping and branding the packages, and the notification of the character of the substance sold.

In 1882 the legislature, finding the previous legislation not sufficient to regulate the manufacture and sale of oleomargarine, and to protect the public against deception, again dealt with the matter in four acts: Chapter 214, " An act to prohibit the coloring of oleomargarine, butterine, and adulterating cheese;" Chapter 215, " An act to regulate the manufacture and sale of oleomargarine, or any form of imitation butter and lard, or any form of imitation cheese, for the prevention of fraud, and the better protection of the public health; " Chapter 238, " An act for the protection of dairymen and to prevent deception in the sales of butter and cheese; " and Chapter 246 : " An act to prevent fraud in the sale of oleomargarine, butterine, suine, or other substances not butter." These acts, among other things, prohibited the coloring of oleomargarine in semblance of butter, the introduction therein of any substance for the purpose of causing it to resemble butter, the sale thereof representing it to be butter, and require the packages containing it to be plainly marked " Oleomargarine Butter," and were plainly intended to protect the people against fraud and imposition.

After two years' experience these stringent acts were not deemed sufficient to accomplish their purpose, and in 1884 the legislature again had the subject under consideration, and passed the act, Chapter 202, " An act to prevent deception in sales of dairy products." In that act the legislature recog-

nized the difficulty of preventing the sales of impure and un-
wholesome milk and imitation butter, and of discovering and
detecting such milk and butter, and therefore created the
office of state dairy commissioner, the incumbent of which
was authorized to employ experts and chemists, and was
armed with power to detect frauds and impositions, and to
enforce the provisions of the act. That act repealed chapter
415 of the Laws of 1877, chapter 439 of the Laws of 1880,
and chapter 214 of the Laws of 1882, and left the other acts
above mentioned in force ; and in section 6 it provided that
·' no person shall manufacture, out of any oleaginous sub-
stances or any compound of the same, other than that produced
from unadulterated milk or cream of the same, any article
designed to take the place of butter or cheese produced
from pure, unadulterated milk or cream of the. same, or
shall sell, or offer for sale, the same as an article of food; "
and imposed severe penalties for violations of the section.
That section was under consideration in this court in the
case of *People* v. *Marx*, (99 N. Y. 377 3 N. Y. Crim., 200,)
which was decided June 16, 1885.

The legislature of 1885 evidently being of the opinion that
the prior legislation was still inadequate to guard the public
health, and protect the people against fraud and deception
in the sale of dairy products and simulated butter, on the
thirtieth of April passed the act under which the defendant
was convicted, entitled " An act to prevent deception in the
sale of dairy products, and to preserve the public health, be-
ing supplementary to and in aid of chapter 202 of the Laws
of 1884." This act did not repeal any of the prior acts, and
in section 20 each section thereof is declared to be enacted
" to prevent deception in the sale of dairy products, and to
preserve the public health," which is said to. be endangered
by the manufacture, sale or use of the article or substances
regulated or prohibited. It prohibits the sale of impure, un-
healthy, adulterated or unwholesome milk, and has many
provisions to prevent and detect fraud and deception in the
sale of dairy products. It enlarges the powers of the dairy

commissioner, and imposes more and severer penalties. Section 6 of the act of 1884 is re-enacted, and section 7 is as follows : " No person, by himself or his agents or servants, shall make or manufacture, out of any animal fat, or animal or vegetable oils, not produced from unadulterated milk, or cream of the same, any article or product in imitation or semblance of, or designed to take the place of, natural butter or cheese produced from unadulterated milk or cream of the same ; nor shall he or they mix, compound with, or add to milk, cream or butter any oils or other deleterious substance, or any animal fats, or any animal or vegetable oils, not produced from milk or cream, with design or intent to render, make or produce any article or substance, or any human food in imitation or semblance of natural butter or cheese ; nor shall he sell, keep for sale, or offer for sale any article, substance or compound made, manufactured or produced in violation of the provisions of this section, whether such article substance or compound shall be made or produced in this state, or in any other state or country." The amendments made by chapter 458 are not now material.

The crime of which the defendant was convicted is plainly described in this section. He did sell an article manufactured out of animal fat or oil " not produced from unadulterated milk, or cream from the same," and it was sufficiently shown, and, indeed, not disputed, upon the trial that the article was manufactured " in imitation or semblance of natural butter." An article must be in imitation or semblance of butter when to the senses it appears like butter, or to be butter, and that was true of this oleomargarine. It was not incumbent upon the people to show that the defendant made the sale with intent to defraud or deceive any one. The statute imposes upon the seller the duty of knowing the nature of the article in which he deals, and absolutely prohibits the sale of the prohibited article. The defendant was therefore legally convicted, if the particular provision of law under which he was indicted was constitutional, and therefore valid; and whether it was or not is the main inquiry in this case.

In approaching this inquiry we should not be unmindful of the important and wholesome rule laid down by many eminent judges, and enforced by a proper respect for the legislative department of the government, that courts will not hold a statutory provision to be unconstitutional, unless a clear and substantial conflict exists between it and the constitution, and that every presumption is in favor of the constitutionality of legislative acts.

Butter is one of the most common articles of human food, used by nearly all the people of our state at every regular meal. Either from prejudice or education or habit, or because of the conviction that it is best and most wholesome, the consumers want butter made from pure milk or cream, and almost unanimously will use no other unless imposed upon. The manufacturers of oleomargarine aim to make their product like butter, and their success is measured by the closeness of their imitation. The final process is to add butterine and color to give it the flavor and external appearance of butter. The manufacturer who sells to the wholesale dealer, like the manufacturer of counterfeit coin, may not himself deceive or intend to deceive any one; and the same may be true of the wholesale dealer who sells in large unbroken packages to persons who buy to sell. But we may, from our general knowledge and observation, assume to know, or we may at least assume that the legislature had information, that the consumers are nearly always deceived when they purchase oleomargarine. They rarely, if ever, seek and buy it as such, and to them it is rarely if ever sold as such. They seek butter, and, in its place, are unwittingly deceived into the purchase of oleomargarine. The president, in his message accompanying his approval of the recent congressional oleomargarine bill, said: "Notwithstanding the immense quantities of the article described in this bill, which is sold to the people for their consumption as food, and notwithstanding the claim made that its manufacture supplies a cheap substitute for butter, I venture to say that hardly a pound ever entered a poor man's house under its real name and in

its true character." And a United States senator, in his speech before the senate in advocacy of the bill, said: "Although it may be sold to the dealer upon its own merits and under its own name, yet the statement which I now make can be verified to the fullest extent; and that is that not less than nine-tenths of all the imitation butter made in this country is sold to the consumer as butter, bought as butter, and used by the consumer believing it to be butter." If these facts are not so notorious, in view of the many acts of the legislature, of the action of congress, the debates in public bodies, and of the discussion in the public prints and in other places, that we may assume judicially to know them, we cannot assume that they are not true, or that the legislators did not know them when they framed this legislation to protect the people against the deception.

That the legislature has the right to pass appropriate laws to protect the people against fraud and imposition is not disputed. The right was most emphatically affirmed in the case of *People* v. *Marx.* There is the same foundation for legislative authority to enact laws to protect against fraud that there is to protect against crime. One who is deprived of his property by theft is no more wronged or outraged than he who is deprived of it by fraud. However, under the mere guise of acts to protect against fraud, the legislature cannot arbitrarily strike down private rights, invade personal freedom, or confiscate private property. The police power must be exercised within its appropriate sphere and by appropriate methods. But laws enacted in the exercise of the police power may be unwise, arbitrary, and unjust, and yet be unassailable in the courts. The sole remedy for them may be an appeal to the people by those who complain of them. As was said in the *Jacobs Case* (98 N. Y., 98), "generally it was for the legislature to determine what laws and regulations are needed to protect the public health, and secure the public comfort and safety; and while its measures are calculated, intended, convenient, and appropriate to accomplish

these ends, the exercise of its discretion is not subject to review by the courts."

This act absolutely prohibits the manufacture and sale of oleomargarine "in imitation or semblance of" natural butter. Did the legislature not have constitutional power to do this? It may absolutely prohibit the sale of adulterated or simulated substances, and has frequently done so. It may punish as a criminal the ignorant seller of an adulterated or forbidden article.    U. S. v. Bayard, 16 Fed. Rep., 384; Commonwealth v. Farren, 9 Allen, 489; Commonwealth v. Wentworth, 118 Mass., 441; Commonwealth v. Smith, 103 id., 444; People v. Cipperly, 37 Hun; 324; 2 N. Y. Crim., 385, reversed in this court 101 N. Y., 634, 4 N. Y. Crim., 69.

Oleomargarine is well calculated to deceive.    It is a close imitation of butter, which cannot be detected by ordinary observation, or the skill and experience which the great bulk of consumers possess.    The legislature had. during several years, tried, by many enactments, various expedients to protect the public against the deception, and to compel the sale of oleomargarine to consumers in its real character.    We may assume that these enactments proved to be inefficient, and failed completely to accomplish their purpose, and that finally the legislature concluded that it could not effectually protect the people against the deception except by entirely suppressing the manufacture and sale of oleomargarine made " in imitation or semblance of butter."    Who shall say that this was not an appropriate means to accomplish the end?    The means may be harsh and vigorous, but we must assume that the legislature, in the exercise of its discretion, after full examination and information, found the exigencies of the case to be such as to require such a measure.    It does not prohibit the manufacture and sale of oleomargarine when so made (as it can be) as not to resemble or imitate butter. The color and butterine added to give it the semblance of butter, contribute nothing to its wholesomeness and usefulness as food.    They may be omitted; and, if consumers

desire it as a cheap food, they will still purchase it. This is not, therefore, a case where a useful branch of industry is stricken down, but is one where it is simply regulated so as to give protection against fraud and deception.

The act, chapter 721 of the Laws of 1871, was in the same line as this legislation. There it was provided that no person should kill, or expose for sale, or have in his possession after the same has been killed, any of the game birds mentioned, between the first day of January and the twentieth day of October in any year, under the penalty of twenty-five dollars, except that a person selling or in possession of the game should not be liable to the penalty up to the first day of March, provided he proved that it was killed before the prohibited time, or outside of the limits of the state where the killing was not prohibited. In that case the legislature concluded that it would not be effectual simply to prohibit the killing of the game during the months mentioned; but to accomplish the purpose of protecting the game it absolutely prohibited the having in possession or selling the same during the prohibited time. The constitutionality of that act was challenged in *Phelps* v. *Racey* (60 N. Y., 10), and CHURCH, Ch. J., writing the opinion of the court, used language quite applicable to this case : " The measures best adapted to this end are for the legislature to determine, and courts cannot review its discretion. If the regulations operate in any respect unjustly or oppressively, the proper remedy must be applied by that body. Some of the provisions of the act in question might seem to one unversed in the mysteries of the subject to be unnecessarily stringent and severe ; but we cannot say that those involved in this action are foreign to the objects sought to be obtained, or outside of the wide discretion vested in the legislature."

While the legislation we are considering is appropriate, and well adapted to protect the public against fraud and deception, we cannot assume that it was adopted for the purpose of suppressing one branch of industry for the mere pur-

pose of fostering and promoting another. *Soon Hing* v. *Crowley*, 113 U. S., 703. We reach the conclusion that the prevision of the law under which the defendant was convicted was constitutional and valid, whether oleomargarine is a wholesome or unwholesome product. We do not deem it important to go any further, and determine whether this provision could also be upheld as enacted to preserve the public health.

The conclusion which we have reached is in no way in conflict with anything decided in the case of *People* v. *Marx*. There we condemned the provision in the act of 1884 which absolutely prohibited the manufacture or sale, as an article of food, of any substitute for butter. The provision we declared to be unconstitutional because the prohibition was not limited to unwholesome or simulated substitutes, but absolutely forbade the manufacture or sale of any compound designed to be used as a substitute for butter, however wholesome, valuable, or cheap it may be, and however openly and fairly the character of the substitute might be avowed and published. The power of the legislature, by appropriate legislation, to protect the people against fraud and deception in the sale of imitation butter was fully recognized. The provision of the law of 1884 condemned by that decision was carried into the law of 1885, enacted before the decision was announced, but the defendant's conviction was in no way based thereon. That provision was eliminated by the amendment of the act of 1885 by the act, chapter 317 of the Laws of 1886.

It follows from these views that there was no error in the rulings of the trial judge, and that the judgment of the general term should be affirmed.

Judgment reversed.

NOTE.—For a clear discussion of the question as to the constitutionality of laws interfering with the state of substances like oleomargarine see Tiedeman's "Limitations of Police Power" 295, 297, where the author comes to the sound conclusion that an absolute prohibition of an article

like this not shown to be in itself injurious cannot be sustained, but that the legislative body has the unquestionable right to restrain such sale when made with intent to deceive the purchaser.

Upon the constitutional questions involved see the briefs of counsel and notes in the following cases : *Matter of Jacobs*, 2 N. Y., Crim., 346, affirmed 2 N. Y. Crim., 539; *People* v. *McGann* 3 N. Y., Crim. 1; *People* v. *Marx*, 3 N. Y. Crim., 11, reversed 3 N. Y. Crim. 200.