* IN THE MATTER OF THE APPLICATION OF EDWARD ANNON FOR A WRIT OF HABEAS CORPUS AND CERTIORARI.

IN THE MATTER OF THE APPLICATION OF F. E. PINTO FOR A WRIT OF HABEAS CORPUS AND CERTIORARI.

*Police power of the legislature — chapter 581 of 1888, fixing a maximum charge for elevating, receiving, weighing and discharging grain by floating and stationary elevators and warehouses, is valid.*

Upon a hearing upon returns to writs of *habeas corpus*, issued upon the application of Edward Annan and F. E. Pinto, it appeared that Annan was a part owner and one of the agents for a floating elevator, engaged in business in and about the harbor of New York, and the defendant Pinto was one of the firm of F. E. Pinto & Sons, engaged in business as warehousemen in the city of Brooklyn, and that, upon an examination held before a magistrate, they were committed to jail, in default of bail, upon a complaint made against them that, on June 21, 1888, they had charged the complainants for elevating, receiving, weighing and discharging grain more than five-eighths of one cent a bushel in violation of the first section of chapter 581 of 1888, which reads as follows: "The maximum charge for elevating, receiving, weighing and discharging grain by means of floating and stationary elevators and warehouses in this State shall not exceed the following rates, namely: For elevating, receiving, weighing and discharging grain, five-eighths of one cent a bushel. In the process of handling grain by means of floating and stationary elevators, the lake vessels or propellers, the ocean vessels or steamships and canal boats, shall only be required to pay the actual costs of trimming or shoveling to the leg of the elevator when unloading, and trimming cargo when loading."

*Held,* That the act was valid, and did not violate that provision of the State Constitution, which provides that no person shall be deprived of life, liberty or property without due process of law.

*Munn* v. *Illinois* (94 U. S., 113); *Slaughter-house Cases* (16 Wall., 36); *Mobile* v. *Yuille* (3 Ala. [N. S.], 140) and *Bertholf* v. *O'Reilly* (74 N. Y., 509) followed.

That a claim made by the appellant's counsel that this case could be distinguished from the *Munn* case, on the ground that the validity of the Illinois statute was placed on the fact that the Chicago warehousemen had a virtual monopoly of the elevator business, and that the facts here showed that no monopoly could exist, could not be sustained, as the court must assume that the legislature had evidence before it which created the demand for legislative regulation, and that the court could not review the decision of the legislature upon that question.

*Bertholf* v. *O'Reilly* (*supra*); *People* v. *Cipperly* (101 N. Y., 634; affirming 37 Hun, 319) followed.

That if any state of circumstances would justify such a statute, the court must presume that it existed.

WRITS of *habeas corpus* and *certiorari* issued to a police justice of the city of Brooklyn to review his action in committing the defendants to the county jail for a violation of the provisions of chapter 581 of the Laws of 1888, fixing a maximum charge for elevating, receiving, weighing and discharging grain by means of floating and stationary elevators.

*William N. Dykman*, for the petitioners.

*Hyland & Zabriskie*, for the People and Canal-boat Owners' Association.

BROWN, J.:

The defendants were arrested for violation of chapter 581 of the Laws of 1888, the first section of which reads as follows:

"SECTION 1. The maximum charge for elevating, receiving, weighing and discharging grain by means of floating and stationary elevators and warehouses, in this State shall not exceed the following rates, namely: For elevating, receiving, weighing and discharging grain, five-eighths of one cent a bushel. In the process of handling grain by means of floating and stationary elevators, the lake vessels or propellers, the ocean vessels or steamships, and canal-boats, shall only be required to pay the actual cost of trimming or shoveling to the leg of the elevator when unloading, and trimming cargo when loading."

The defendant Annan was part owner and one of the agents for a floating elevator engaged in business in and about the harbor of New York; and the defendant Pinto is one of the firm of F. E. Pinto & Sons, engaged in business as warehousemen in the city of Brooklyn. The complaint against the defendants is that on the twenty-first day of June last they each charged the complainants for elevating, receiving, weighing and discharging grain more than five-eighths of one cent a bushel. Upon an examination held before a magistrate, the defendants were committed to jail in default of bail, pending their trial, and have instituted these proceedings for the purpose of procuring their discharge upon the ground that the act of the legislature, aforesaid, under which they were arrested, violates that provision of the State Constitution which provides that no person shall be deprived of life, liberty or property without due process of law.

So much has been written within the last few years upon this constitutional safeguard, and the meaning of the terms quoted have been so fully discussed in recent cases in both State and federal courts, that it would be superfluous for me to attempt to add anything to what the courts have already said, or to do more than refer to the conclusions that have been reached, and apply them to the case under consideration. For full discussion of the subject I refer to the following cases: *Live Stock Association* v. *The Crescent City, etc., Co.* (1 Abb. [U. S.], 398); *Slaughter-house Cases* (16 Wall., 36); *Munn* v. *Illinois* (94 U. S., 113); *Bertholf* v. *O'Reilly* (74 N. Y., 509); *Matter of Jacobs* (98 id., 98); *People* v. *Marx* (99 id., 377); *People* v. *Gillson* (16 N. Y. State Rep., 185); *Mugler* v. *Kansas* (123 U. S., 623). While the general proposition is conceded that a person living under our Constitution has the right to adopt and follow such lawful business, not injurious to the community, as he chooses, yet this right is subject to the power inherent in the legislature to regulate the use of all property, and the conduct of all citizens toward each other when necessary for the public good.

This power is usually denominated the police power of the State. Its exact boundaries and limitations have never been judicially established by any general rule, and probably never will be. Each case, as it arises, must be determined upon its own facts. While it may be difficult in many cases to reconcile the conclusions of different courts upon similar facts, all agree upon a few general rules that must control in determining the validity of the law. Courts are confined to the single question whether the act in question exceeds the utmost limits of legislative power. If it does not, if it can stand when brought to the test of the Constitution, the question of its validity is at an end, and the judicial department of the government cannot refuse to recognize and enforce it. It may be opposed to our opinion of natural justice, or its operation may appear to be inequitable towards a large class of citizens; but if it is a valid exercise of legislative power, we cannot judicially con demn it. It was said by Chief Justice WAITE, in *Munn* v. *Illinois* (94 U. S., 132): "For us the question is one of power, not of expediency. If no state of circumstances could exist to justify such a statute, then we may declare this one void, because in excess of the legislative power of the State. But *if it could, we must presume it did.*

Of the propriety of legislative interference within the scope of legislative power, the legislature is the exclusive judge. The controlling fact is the power to regulate at all.   *   *   *   If that exists, the right to establish the maximum of charges as one of the means of regulation is implied."

In *People* v. *Marx*, RAPALLO, J., states the question as follows: " Conceding that the only limits upon the legislative power of the State are those imposed by the State Constitution, and that of the United States, we are called upon to determine whether or not these limits are transgressed by an enactment of this description."  *  *  * And Judge COOLEY, in his work on Constitutional Limitations ([5th ed.], pp. 222, 223, m. p. 186, 187), says : " Whether a statute is constitutional or not is always a question of power.   *   *   *   In any case in which this question is answered in the affirmative, the courts are not at liberty to inquire into the proper exercise of the power.   *   *   *   *If evidence was required it must be supposed that it was before the legislature when the act was passed ; and if any special finding was required to warrant the passage of the particular act, it would seem that the passage of the act itself might be held equivalent to such finding.*"

We have, therefore, but a single question in the case, viz.: Has the legislature the right to regulate the use of property of the character specified in the act in question at all ? This question must receive an affirmative answer.   The power has been exercised as to various classes of property since the formation of the State, and the reports are full of decisions upholding the authority of the State to regulate the use and enjoyment of property, and the control of private business in many ways ; and in the case of grain elevating business we have the case of *Munn* v. *Illinois* as a distinct adjudication in favor of the validity of such a law as the one in question.

The citations I have made are a sufficient answer to the arguments of the learned counsel for the appellant, that this case can be distinguished from the Munn case, on the ground that the validity of the Illinois statute was placed on the fact that the Chicago warehousemen had a virtual monopoly of the elevator business, and that the facts here show that no monopoly could exist.   How can this court say that no monopoly exists, or may not exist, in some or all

of the cities of this State named in the law, if it be that the existence of a monopoly is the fact which justifies such legislation. We must assume that the legislature had evidence before it which created the demand for legislative regulation, and we cannot review its decision upon that question. Certainly the evidence taken upon a prosecution for violation of the provisions of the law cannot justify the assertion that the facts surrounding the business did not create a demand for the law. As was said by Chief Justice WAITE in the Munn case, " if no state of circumstances could exist to justify such a statute, then we may declare this one void, * * * but if it could, we must presume it did."

I fail to see how we can give any effect to the evidence taken before the magistrate on the question of the law's constitutionality. The act is not made applicable to persons who possess a virtual monopoly of the business of elevating grain, but to certain political divisions of the State, and within those divisions is applicable to every individual. It cannot be a valid law as to Mr. Annon and an invalid one as to Mr. Pinto, and yet if the court is to determine in every case that arises under the law, whether or not a monopoly exists, we might reach different conclusions in different cases. It would certainly be a strange system of practice, assuming the court could review the decision of the legislature upon questions within the scope of legislative power, that it should do so without having before it the evidence on which the legislative decision was based. But such is not the law.

In *Bertholf* v. *O'Reilly* (74 N. Y., 509), the Court of Appeals asserted that there was no limitation upon legislative power, except the limits and restraints of the Constitution and the case of *People* v. *Cipperly* (101 N. Y., 634) on the opinion of Justice LEARNED, reported in 37 Hun, 324, is a direct authority against the point so ably argued by the learned counsel for defendants, that the court will look into the evidence taken on the trial and see whether a proper case exists for legislative interference.

In considering the question whether the legislature could prohibit the sale of milk drawn from healthy cows which, in its natural state, fell below the standard fixed by the act, that learned justice says : " Is that to be a question for the jury ? If so, the court must charge a jury in each case that, if they find milk below that standard

to be unwholesome, then the statute is constitutional; if they find it to be wholesome, then the statute is unconstitutional. Evidently a constitutional question cannot be settled or rather unsettled in that way. The constitutionality would vary with the varying judgments of juries."

The circumstances surrounding the business in this State are substantially the same as developed in the Munn case. The great grain-producing region of the west and north-west sending its grain by rail and water to Chicago, and making that city one of the great markets of the world, created a demand for means to handle and store the grain, and these means were found in the elevators and warehouses. Fourteen elevators and warehouses adapted to this business in the city of Chicago, the case states, were controlled by nine business firms, by whom the prices for elevating and storing grain were fixed and regulated. In this case we know that all grain brought into the cities named in the act in question arrives in cars or boats. That whether it be stored in warehouses or be reshipped to other places, it demands stationary and floating elevators to handle it. That in the harbor of New York the evidence informs us at least five different business firms operate and control floating elevators, and that the charges are fixed by a committee of the Produce Exchange, of which body some or all of these firms are members. It is apparent, therefore, that the opportunity for a virtual monopoly is the same in each case. The element necessary to create it in each case was combination, and whether there was, or had been, or might be such a combination as to justify the interference of the legislature to regulate the use of this class of property, we must presume was a question upon which the legislature had sufficient evidence. At all events, it is impossible for me to distinguish this case from the Illinois case. That statute is a precedent for legislation of this character, and the decision of the Supreme Court of that State and of the Supreme Court of the United States, and the substantial approval it received from the Court of Appeals in *Bertholf* v. *O'Reilly*, are decisive of the constitutionality of the law.

The *Slaughter-house Cases* (16 Wall., 36), *Mobile* v. *Yuille* (3 Ala. [N. S.] 140), and *Bertholf* v. *O'Reilly* (74 N. Y., 509), are also distinct authorities in favor of the validity of laws of this character. In the latter case it was sought to have declared invalid

that part of the civil damage act which makes the owner of real estate liable for damage resulting from the sale of liquor upon his property, upon the same ground that the law under consideration is now attacked, but the Court of Appeals held that it was a proper regulation of the use of property, and in the opinion cited the Slaughter-house cases and the Munn case, with approval, as furnishing examples of the due exercise of the police power by the State, and Judge ANDREWS, speaking of and quoting from them, says, that "*they illustrate the scope of the police power in legislation.*" There is nothing in the more recent decisions of our Court of Appeals, to which we have been referred, that is in conflict with the authorities I have cited.

In *People* v. *Gillson* (16 N. Y., State Rep., 185), the court held that chapter 691, Laws of 1887, was in no aspect valid as a health law, nor was it a regulation of the use of property or of trade in food. Chapter 202, Laws of 1884, section 4, which was declared invalid in *People* v. *Marx* (99 N. Y., 377), absolutely prohibited the manufacture or sale as an article of food of any substitute for butter or cheese, however wholesome or however openly and fairly its character was avowed and published. Such a law has nothing in common with the law in question. The tenement-house cigar act (chap. 272, Laws of 1884), considered in *Matter of Jacobs* (98 N. Y., 98), was declared invalid for the reason that it was apparent on the face of the law that it was not intended to protect health nor as a regulation of the use of property Says EARL, J.: " It does not deal with tenement-houses as such; it does not regulate the number of persons who may live in any one of them, or be crowded into one room, nor does it deal with the mode of construction for the purpose of securing the health and safety of their occupants, or of the public generally. * * * This law was not intended to protect the health of those engaged in cigar-making, * * * (nor) to protect the health of that portion of the public not residing in the forbidden tenement-houses. * * * Nor was it intended to improve or protect the health of the occupants of tenement-houses. * * * It is plain that this is not a health law and that it has no relation whatever to the public health." Such a law has clearly nothing to justify or support it, and was a plain invasion of the constitutional rights of the persons affected by it.

Laws which are intended to regulate the use of property in connection with the great products of the country, and especially with the necessaries of life, are plainly not to be classed with such laws as were considered in the cases just cited. The sale of the property may not be prohibited when it is not unlawful nor injurious to the public and when its character is frankly avowed; nor can lawful employment be prohibited when its prosecution is not injurious to those engaged in it, nor to the general public, without violating the safeguards of the Constitution. But property used in handling and storing the great staple articles of food and the n essaries of life, by which use a tax or toll is levied thereon, ceases while applied to such use to be *juris privat* only, and becomes affected with a public interest, and such use may be regulated by the legislature without encroaching upon any of the constitutional rights of the owner.

I think the law in question valid, and the proceedings must, therefore, be dismissed and the defendants remanded to the custody of the sheriff.

BARNARD, P. J., and PRATT, J., concurred.

Writ dismissed.