PEOPLE ex rel. BRIXTON OPERATING CORPORATION, Relator, *v.* EDWARD B. LA FETRA, a Justice of the City Court of the City of New York.

(Supreme Court, New York Special Term, December, 1920.)

Constitutional law — constitutionality of Laws of 1920, chap. 942 — summary proceedings — landlord and tenant.

Mandamus — when application for a peremptory writ of, denied — City Court of the city of New York — summary proceedings — statutes — landlord and tenant.

The statute (Laws of 1920, chap. 942) which, after declaring that a "public emergency" exists, suspends for a period of about two years from September 27, 1920, in the city of New York and in cities and counties adjacent thereto, the remedy of summary proceedings to recover the possession of real property on the ground that the tenant was holding over his term, except, etc., is constitutional and valid.

Where an application, made to a justice of the City Court of the city of New York for a precept initiating a summary proceeding on the ground that the tenant was holding over after the expiration of his term, was refused on the ground that the proposed proceeding was not one of those authorized and provided by said statute of 1920, an application for a peremptory writ of mandamus requiring said justice to sign, issue and deliver to relator such a precept, will be denied.

MOTION for a peremptory writ of mandamus.

Stoddard & Mark (George L. Ingraham and John M. Stoddard, of counsel), for motion.

John P. O'Brien, Corporation Counsel (George P. Nicholson and Russell Lord Tarbox, of counsel), opposed.

Charles D. Newton, Attorney-General (Robert P. Beyer, Deputy Attorney-General, of counsel), opposed.

William D. Guthrie and Julius Henry Cohen, Special Deputy Attorneys-General, opposed.

Elmer G. Sammis and Bernard Hershkoff, for Joint Legislative Committee on Housing, opposed.

Giegerich, J.   The relator seeks a peremptory mandamus requiring the respondent, a justice of the City Court of the city of New York, to sign, issue and deliver to the relator a precept initiating a summary proceeding based upon the ground that the tenant was holding over after the expiration of his term.   Prior to making this motion for a mandamus the relator applied to the respondent for such a precept, which was refused on the ground that the proceeding proposed by the relator was not one of those authorized and provided by chapter 942 of the Laws of 1920.   The motion is opposed by the corporation counsel on behalf of the respondent, and by the attorney-general, by special deputy attorneys-general, and by counsel for the joint legislative committee on housing.   The briefs devote attention chiefly to the constitutionality of the statute above referred to, which, with other related statutes, popularly known as the Rent and Housing Laws, being chapters 942 to 953 of the Laws of 1920, were enacted at an extraordinary session of the legislature on September 27, 1920.   Chapter 942, cited by the respondent justice in denying the application for a precept, suspended, for a period of about two years, in the city of New York, and in cities in counties adjacent thereto, the remedy of summary proceedings to recover pos-

session of real property on the ground that the tenant was holding over his term, except where the proceeding was based upon one of four grounds: (1) That the person holding over is objectionable; (2) where the owner seeks to recover the property for his personal use; (3) where the purpose is to demolish the existing structure in order to rebuild, and (4) where the building has been sold under a co-operative form of ownership. The reasons why the laws above referred to were enacted are well known. The war had stopped all construction of dwellings. All the energies and resources of the country had been turned to war purposes. Even before we entered the contest increasing costs of building had brought about an almost complete cessation of construction. After the war ended the prohibitive costs continued, and even grew worse up to the time these laws were passed. The consequence was, therefore, that the normal building operations necessary to keep pace with the needs of the rapidly increasing population of the city had been suspended for several years. The consequence was that the lack of housing space became extreme and distressing. Rents had gone up by leaps and bounds. Overcrowding to such an extent as to endanger health and morals resulted. There was great social unrest and discontent. The culmination was reached in September, 1920. In the April previous remedial legislation had been attempted, but it had worked imperfectly and had not accomplished its purpose. In September dispossess notices in unprecedented numbers all through the city had been served for October first, the day on which most leases of dwellings in this city terminate. A panic fell upon the people, because those threatened with eviction could find no other place to go, and there was danger that thousands of families would be turned out into the streets. At this juncture of affairs the

34

legislature was called to an extraordinary session by
the governor, and the group of twelve statutes, of
which chapter 942 above referred to is one, was
enacted.  In support of the application for a man-
damus the relator urges that the statute in question
violates section 10 of article 1 of the Federal Consti-
tution and is void because its effect is to impair the ob-
ligation of a contract existing at the time the statute
was passed.  The argument is that the obligation of
the contract itself is impaired by depriving the land-
lord of a remedy that has existed in this state since
1820, and that, too, the only really effective remedy,
because ejectment is so expensive and dilatory that it
has been said by our highest court that in many in-
stances it amounted to a denial of justice.  *Reich* v.
*Cochran,* 201 N. Y. 450, 453.  It may be observed that
chapter 947, of the same group of statutes, suspends
for the same period of two years the remedy of eject-
ment, except in the same cases where summary pro-
ceedings are allowed by chapter 942.  It might be pos-
sible to dispose of this motion by drawing a distinction
between the statutory remedy of summary proceed-
ings and the common-law remedy of ejectment and to
hold that the legislature had power to take away the
remedy it had once given and not to attempt to pass
upon the fundamental question of the constitutionality
of the act of the legislature in taking away, for the
time being and under the conditions specified, both
remedies.  Since the broad ground of constitutionality
has been exhaustively argued, however, in very learned
and able briefs, I will decide the question upon that
ground, as it is possible to decide it, because, in my
view, the statutes in question are within the police
power of the legislature and valid.  In discussing the
question I shall consider, without any attempt at for-
mal separation, both of the constitutional grounds of

objection urged against the statute by the relator, the second ground being the claim that the legislation violates the Fourteenth Amendment of the Federal Constitution, which prohibits states from depriving persons of property without due process of law, and the similar provision contained in section 6 of article 1 of the Constitution of the state of New York. In a final analysis, impairing the obligation of a contract deprives the aggrieved individual of property, in the full sense of that word, just as truly as taking any other form of property does. At the outset, in the consideration of the constitutional question presented, it should be remembered that the meaning of the words police power and the meaning of the word property are not and cannot be fixed and unchanging. The two concepts are more or less in conflict, and as one is enlarged the other is sometimes correspondingly diminished. The one represents the right of the community to protect itself. The Roman maxim was *Salus populi suprema lex.* The other represents the right of the individual to dominion over such things as are permitted by the state to be the subjects of ownership. But the individual right of dominion extends only so far as the welfare of the community permits it to extend, or probably it would be more accurate to say so far as the preponderant public sentiment of the time deems that the welfare of the community can safely permit it to extend. As John Stuart Mill expresses it, " The idea of property is not some one thing, identical throughout history and incapable of alteration, but is variable like all creations of the human mind; at any given time it is a brief expression denoting the rights over things conferred by the law or custom of some given society at that time; but neither on this point nor on any other has the law and custom of a given time and place a claim to be stereotyped forever." 31

Fortnightly Review, 513; Chapters on Socialism, 527. This latter idea was expressed by the United States Supreme Court as follows: " It would be a bold thing to say that the principle is fixed, inelastic, in the precedents of the past and cannot be applied though modern economic conditions may make necessary or beneficial its application   In other words, to say that government possessed at one time a greater power to recognize the public interest in a business and its regulation to promote the general welfare than government possesses today." *German Alliance Ins. Co.* v. *Kansas,* 233 U. S. 389, 411. As industrial and economic and social conditions change, and indeed as public sentiment changes, the idea of property changes, and with it the correlated idea of police power changes. In general it may be said that as population becomes more dense and concentrated in very large cities, with the corresponding increase in complexity of organization made necessary to support so large a population in so small an area, the police power is enlarged and individual property rights, in many cases, have to be correspondingly diminished and curtailed in the public interest. It may not be without significance that the necessity for this new application of the police power has manifested itself, generally speaking, in the largest centers of population not only in this country, but also in other countries deeply affected by the war. Whatever injuries an individual may suffer in the diminution of his property rights are, however, deemed to be made up to him by his sharing in the general benefits which the regulations secure to the community of which he is a member. *People ex rel. Nechamcus* v. *Warden,* 144 N. Y. 529, 535; *Matter of Wilshire,* 103 Fed. Repr. 620, 622. As might be expected, a distinct progress is to be observed in judicial decisions, and per-

haps nowhere in a more marked degree than in the decisions of the Supreme Court of the United States, toward broader recognition of the police power. This is no more than to say that as modern life becomes more highly organized and the industrial and economic and social relations of individuals become more complex, so that each becomes more dependent on others and, in turn, each plays a part, however humble or however important, which has a relation to the convenience or comfort or necessity of others, the courts are recognizing these changing conditions and are keeping pace in their decisions and are allowing legislatures to meet the new needs that arise with appropriate laws. It is noticeable in the carefully prepared and excellent briefs before me that the decisions cited in support of the property rights claimed by the relator are for the most part decisions of a generation ago, while the decisions relied upon to support the police power are those rendered in recent years. It was in *Noble State Bank* v. *Haskell,* 219 U. S. 104, 111, that Mr. Justice Holmes said " the police power extends to all the great public needs " and that " it may be put forth in aid of what is * * * held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare." And it was in a still more recent case (*Atlantic Coast Line R. R. Co.* v. *Goldsboro,* 232 U. S. 548, 558) that the court said: " For it is settled that neither the ' contract ' clause nor the ' due process ' clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort or general welfare of the community * * * and that all contract and property rights are held subject to its fair exercise." In the present case I think it must be said that the legislative power was

fairly exercised. That a " public emergency " existed there can be no reasonable doubt. The statute recites that such was the case, and the facts abundantly sustain the recital. But these laws are assailed as not being reasonably adapted to attain the end sought. *Matter of Jacobs,* 98 N. Y. 98; *Lawton* v. *Steele,* 152 U. S. 133. It is said that the evil to be cured is the scarcity of housing and that the building of more dwellings will not be promoted by depriving the owners of dwellings that now exist of the control of their property and curtailing their profits. It is true that the fundamental evil was the scarcity of dwelling space, but there was another more urgent evil, and that was the impending eviction of thousands of families. I recognize that there is abundant room for argument as to whether the means adopted by the legislature were the best calculated to attain the end sought. But the selection of the means rests with the legislature, not with the courts. As was said in *People* v. *Griswold,* 213 N. Y. 92, 97 : " Legislation passed in the exercise of the police power must be reasonable in the sense that it must be based on reason as distinct from being wholly arbitrary or capricious, but when the legislature has power to legislate on a subject the courts may only look into its enactment far enough to see whether it is in any view adapted to the end intended. If it is, the court must give it effect, however unwise they may regard it, or however much they might, if given the choice, prefer some other measure as more fit and appropriate." Judged by the foregoing test, the act under consideration quite clearly should not be annulled by the courts. It should, perhaps, be observed in this connection that provisions were made in some of the other bills passed at the same time designed to stimulate the building of dwellings. It may be well, also, to mention the fact that the land-

lord, taking this legislation in its entirety, is not deprived of income from his property; he is only prevented from collecting an unjust and unreasonable rent. Laws of 1920, chap. 944. Objection is also made that the enactments in question protected tenants in possession at the expense of other persons who were in search of places to live and who would have been eager to take the vacated dwellings. There is nothing to show that such persons were without any shelter at all, however, as apparently would have been the fate of thousands threatened with eviction, and, besides, as is shown in a portion of the principal brief submitted in support of the legislation, there is a principle well recognized in many widely separated parts of the world and at various periods of time that tenants in possession have rights superior to strangers who desire to obtain possession. I regret that the great length to which this opinion has grown forbids my making use of the interesting and pertinent historical data which has been gathered with such erudition and presented in such an effective way. It must suffice to say that in different parts of the British Empire and in New York and Maryland there are precedents for giving preference to tenants in possession, and in many cases such precedents go to the extent of having the rent and conditions of occupancy determined by some tribunal created or selected for that purpose where the landlord and the tenant are unable to agree. My conclusion that the enactment in question is constitutional is supported by the decisions of a number of other judges in this state who have had the question before them either under the statutes of last April or the more recent September statutes. Among such decisions are 78*th Street & Broadway Co.* v. *Rosenbaum,* 111 Misc. Rep. 577; *Paterno Investing Corp.* v. *Katz,* 112 id. 242; *Kuenzli* v. *Stone,* Id. 125; *People ex rel.*

**536** People ex rel. Durham R. Corp. *v.* La Fetra.

Supreme Court, December, 1920.        [Vol. 113.

*Wasserman* v. *Fagan,* 113 id. 255; *Hyman* v. *Gordon,* N. Y. L. J., Oct. 28, 1920; *Guttag* v. *Shatzkin,* 113 Misc. Rep. 362, and *Ullmann Realty Co.* **v.** *Tamur,* Id. 538. The opinion in the case last mentioned is extended and is rich in the citation of supporting authorities. My decision is that the statute in question is constitutional and valid and that the refusal of the respondent to issue the precept sought was right and that the application for a mandamus should be denied, with fifty dollars costs.

Application denied, with fifty dollars costs.