Francis R. Moran, J.
Plaintiff A. E. Nettleton Company seeks a judgment declaring section 358-a of the Agriculture and *886 Markets Law and section 187 of the Conservation Law of New York State unconstitutional and to enjoin enforcement of their provisions. Plaintiff then brought on a motion to enjoin enforcement of these statutes, pending a disposition of the original action for declaratory judgment.
Plaintiff claims, and no one disputes that it is one of the leading manufacturers of men’s footwear in the country. The alligator shoes .presently being manufactured by plaintiff are made from the species generally known as tinga or tinga alligator (two species of the caiman family known as caiman latirostris and caiman sclerops). These reptiles are indigenous to South America and are not designated as endangered species by the Secretary of Interior of the United States Government.
Plaintiff states that the alligator shoes constitute approximately 15% of total sales,, the largest proportion of which are sold to dealers outside the United States. If the New York State laws become operative, plaintiff claims it will be forced to conduct the manufacture and sale of alligator shoes outside of New York State in order to compete with other shoe manufacturers who produce alligator shoes. Plaintiff’s customers buy their entire line of shoes from one manufacturer. If alligator shoes are not available from the plaintiff, customers will seek other suppliers.
In 1969, Congress passed the Endangered Species Conservation Act of 1969 (83 U. S. Stat. 275; U. S. Code, tit. 16, § 668aa et seq.). This act represents a comprehensive approach to the preservation of certain species of wildlife threatened with worldwide extinction. The Secretary of the Interior is empowered to promulgate a list of those species deemed to be endangered, after he has consulted with scientists, conservation groups, business interests,, foreign governments and any other interested parties.
The Federal law renders unlawful the importation from any foreign country into the United States of species designated by the Secretary as endangered. It also prohibits the transportation or sale of hides of endangered species or products made therefrom to the extent they are imported into the United States contrary to the Secretary’s determination. This act became effective after December 5, 1969.
There is no dispute about the purpose of the Federal act which encompasses the protection of wild mammals, fish, wild birds, amphibians,- reptiles, mollusks or crustaceans which are threatened with worldwide extinction.
The State of New York thereafter decided to include itself in those governing bodies that are genuinely interested in the *887 preservation of certain species of wild animals. This was in keeping with its renowned leadership in the field of conservation. Two laws resulted from this conservation concern.
Section 358-a of the Agriculture and Markets Law, popularly known as the Mason Act, specifically prohibits the sale or offering for sale within the State of New York of the skin or body of certain designated species of animals. The section designates Alligators, Caiman or Crocodile of the Order Crocodylia ”.
The designati tinga or tinga ipn of the Order Crocodylia includes the species alligators, the species singularly relating to the plaintiff’s business. This act, by prohibiting after September 1,1970, the sale or offer for sale of any crocodilian skin or product made therefrom, renders inoperative in New York State all channels of trade in such skins or products. None of the prohibited species are indigenous to New York State.
The effect of the Mason Act then is to prevent commerce in crocodilian go;ods at all levels in the State of New York.
Not content to rally behind the Mason Act, the Legislature at the same session thereof passed another act, section 187 of the Conservation Law. The relevant parts read as follows:
‘1 Section 1. Legislative findings. The legislature of the state of New York hereby finds that the protection of endangered species of wildlife is a matter of general state concern. The recently enacted Federal Endangered Species Conservation Act of 1969 provides for the protection of species of wildlife threatened with worldwide extinction and for restricting and regulating the interstate transportation of wildlife taken in violation of state, national or foreign laws. The states, however, must assume the responsibility of restricting the transportation, possession and sale of these species within their respective jurisdictions to assure the continued survival of many of the nation’s endangered species of fish and wildlife. The legislature hereby finds that by eliminating the market for these species in New York State, the potential for their continued existence will be strengthened.
“ § 2. The conservation law is hereby amended by inserting therein a new section, to be section one hundred eighty-seven, to read as follows:
1 ‘ § 187. Endangered species. Notwithstanding any other provision of this chapter, the importation, transportation, possession or sale of any endangered species of fish or wildlife, or hides or other parts thereof, or the sale or possession with intent to sell any article made in whole or in part from the skin, hide or other parts of any endangered species of fish or wildlife is prohibited, except under license or permit from the Depart *888 ment. For the purposes of this section, endangered species shall mean those species of fish and wildlife designated by the department, by order filed with the secretary of state, as seriously threatened with extinction.
“ Such order shall include, but not be limited to, endangered species as so designated by the Secretary of the Interior on the date this act shall take effect, provided, however, that such order shall take effect sixty days after it has been filed with the secretary of state, and provided, further, that the commissioner may, by order, exclude any such species as he may determine after investigation to be no longer endangered from the restrictions of this section.”
The new section 187 of the Conservation Law, which authorizes the Conservation Department to compile a list of endangered species the possession or sale of which would be unlawful, is based upon the stated legislative finding set forth in the act that the States must assume the responsibility of restricting the transportation, possession and sale of the species sought to be protected under the Federal act within their respective jurisdictions to assure the continued survival of the Nation’s endangered species of wildlife. However, the act goes beyond the findings, in that it authorizes the Department of Environmental Conservation to include on the list of endangered species other species which are not included on the list compiled by the Secretary of the Interior. In addition the act authorizes the listing of species which are not indigenous to any of the States of the United States.
Section 187 of the Conservation Law, also known as the Harris Act, blends itself very well with the Federal regulatory scheme. It is evident from a comparison, the Federal statute and the Harris Act, that the two statutes should complement each other. The Harris Act prohibits the importation, transportation, possession or sale in New York of the skins of certain species designated by the Department of Conservation as endangered or of products therefrom. Such endangered species are to include the species determined to be endangered by the Secretary of the Interior. As presently constituted and implemented, the Harris Act does not violate any due process rights of the plaintiff guaranteed by either the United States or New York State Constitution. Our interest now is solely directed toward the validity of the Mason Act.
The intervenors, namely, J. Fox, Inc., Reptile Products Association, Inc., Sibley, Lindsay & Curr Company, a Division of Associated Dry Goods Corporation, and New York State Council of Retail Merchants, also contest the constitutionality of the *889 Mason Act. Their primary concern is the fact that since the Mason Act becomes effective September 1,1970, banning the sale of any and all crocodiles, and since the act contains no exemption for goods previously purchased in good faith by retailers and others, the intervenors will suffer irreparable financial damage. For example, the Reptile Products Association, Inc.,, composed of business firms that are importers, processors, tanners, wholesale and retail dealers, claim an inventory of skins and hides, acquired prior to the passage of the Mason Act (May 20, 1970); and to put the act in effect September 1, 1970 Would amount to an unwarranted confiscation of property, the fair market value of which exceeds $5,000,000.
The intervener, J. Fox, Inc., in the same commercial enterprise as the reptile people, except their specialty is fur goods, instead of skins, claims a similar loss of inventory which is in excess of $10,000,000 and which was contracted for prior to the passage of the New York State laws. The attack by plaintiff and the intervenors is directed against the all-inclusive Mason Act.
The questions posed by plaintiff and the intervenors are whether the act is:
1. Contrary to the provisions of the Federal Endangered Species Conservation Act of 1969 which pre-empted the field.
■2. Whether the act constitutes a deprivation of due process of law in violation of the 14th Amendment and section 6 of article I of the New York State Constitution.
3. Whether the act creates an unlawful burden on interstate commerce in violation of the United States Constitution (art. I, § 8, cl. 3).
Addressing ourselves to the question of Federal pre-emption, we note that conservation and specifically the regulation of fish and .animals are traditionally the responsibility of the States under our Federal system. (Barrett v. State of New York, 220 N. Y. 423, 427.) The federal act itself anticipated State involvement in the conservation of these species. Under the section headed, Purpose, the act mentions that it will “ assist the States in protecting domestically endangered species of reptiles ’ ’ and other wild animals and also ‘‘ supplement existing statutes which currently prevent the interstate sale or purchase of State or foreign government protected fish, mammals and birds. ’ ’
The Supreme Court addressed itself to the question of Federal pre-emption in San Diego Unions v. Garmon (359 U. S. 236, 241-242): “ In determining the extent to which state regulation must yield to subordinating federal authority, we have been concerned with delimiting areas of potential conflict; potential conflict of rules of law, of remedy, and of administration. The nature of *890 the judicial process precludes an ad hoc inquiry into the special problems of labor-management relations involved in a particular set of occurrences in order to ascertain the precise nature and degree of federal-state conflict there involved, and more particularly what exact mischief such a conflict would cause. Nor is it our business to attempt this. Such determinations inevitably depend upon judgments on the impact of these particular conflicts on the entire scheme of federal labor policy and administration. Our task is confined to dealing with classes of situations. To the National Labor Relations Board and to Congress must be left those precise and closely limited demarcations that can be adequately fashioned only by legislation and administration. We have necessarily been c'oncerned with the potential conflict of two law-enforcing authorities, with the disharmonies inherent in two systems,, one federal the other state, of inconsistent standards of substantive law and differing remedial schemes. But the unifying consideration of our decisions has been regard to the fact that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience ” (emphasis added). The Supreme Court then proceeded to find that these State laws were pre-empted, that to leave the States free to regulate conduct “ so plainly within the central aim of federal regulation ” would have involved too great a danger of conflict between power asserted by Congress and requirements imposed by State law, and that regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would “ create potential frustration of national purposes ” (p. 244, emphasis added), in violation of the mandate of the Supremacy Clause.
The conduct sought to be regulated here is not so plainly within the central aim of Federal regulation that to allow States to regulate any part of it would violate the Supremacy Clause of the United States Constitution. Therefore, there is nothing about the nature of the subject to be regulated or the declaration of Congressional design to lead one to the legal conclusion that the alligator and crocodylia reptiles demand exclusive Federal regulation.
On the question of due process, the Attorney-General mounts his most formidable defense in that citadel called the State’s police power. Case law on the definition of police power is relevant to this discussion.
The dissent in Defiance Milk Prods. Co. v. Du Mond (309 N. Y. 537, 544) offered these comments concerning police power:
*891 “ That statute was enacted pursuant to the police power — the power inherent in a government to enact laws, within constitutional limits, to promote the order, safety, health,, morals, and general welfare of society. The police power ‘ corresponds to the right of self-preservation in the individual, and is an essential element in all orderly governments, because necessary to the proper maintenance of the government and the general welfare of the community. * * * On it depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property, and it has been said to be the very foundation on which our social system rests. * * * It has been said that the scope of the police power is as broad as the public welfare or necessity, and must be exercised in the interest thereof, that it is the least limitable of the powers of government, and that the police power is the broadest in scope of any field of governmental activity ’ (16 0. J. S., Constitutional Law, § 175). * * *
‘11 The State courts should uphold State regulation whenever possible. They should be .clearly convinced that a statute is unconstitutional before they declare it invalid. (Cf. Ives v. South Buffalo Ry. Co., 201 N. Y. 271, with Arizona Employers’ Liability Cases, supra [250 U. S. 400]; also cf. People ex rel. Rodgers v. Coler, 166 N. Y. 1, with Atkin v. Kansas, supra [191 U. S. 207].)
The unanimous decision in Barrett v. State of New York (220 N. Y. 423, 428, supra) had this to say about the subject:
" The state may exercise the police power ‘ wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests. To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. ’ (Lawton v. Steele, 152 U. S. 133, 136.)
" The police power is not to be limited to guarding merely the physical or material interests of the citizen. His moral, intellectual and spiritual needs may also be considered. The eagle is preserved, not for its use but for its beauty.”
People v. Gillson (109 N. Y. 389, 400), referring to police powers, said: “ This brings us to the consideration of the question whether the act is valid as a proper exercise of what is, by *892 way of classification, called the police power of the state. That power has never yet been fully described nor its extent plainly limited further, at least, than this; it is not above the Constitution, but it is bounded by its provisions; and if any liberty or franchise is expressly protected by any constitutional provision it cannot be destroyed by any valid exercise by the legislature or the executive of the police power. The extent of this power has been the subject of discussion in this court, and in the recent and most important case of In re Jacobs (98 N. Y. 107), the question was examined and most exhaustively reviewed by Eabl, J., in his opinion. To re-open the subject now would be useless, and. I refer to that case as authority for the statement that .the legislature cannot, without reason and arbitrarily, infringe upon the liberty or the property rights of any person within the protection of the Constitution of this state; and that if the legislature shall determine what is a proper exercise of its police power, its decision is subject to the scrutiny of the courts. The subject was again reviewed in the People v. Marx (99 N. Y. 377), in an opifiion written by Rapallo, J., and concurred in by the whole court.”
The court is mindful of the inherent power of the State to regulate, in order to promote the general welfare of its citizens. The court is further aware of the rule of law that legislative enactments are presumed to be constitutional, and, while this presumption is rebuttable, unconstitutio.nality must be demonstrated beyond a reasonable doubt. (Wiggins v. Town of Somers, 4 N Y 2d 215; Wasmuth v. Allen, 14 N Y 2d 391.)
Before continuing, it must be pointed out that neither the parties hereto, the attorneys nor the court have the slightest quarrel with the urgent necessity for protecting certain species of wildlife that are in danger of becoming extinct. The affidavits of reputed knowledgeable experts in the field testify to the real and imminent danger of animals becoming extinct.
But the paramount consideration for the court is whether the Mason Act is violative of due process or is a valid exercise of the police power of a State.
To the extent the Mason Act includes all 27 subspecies of crocodylia, none of which are indigenous to New York State and without regard to whether they are endangered or not, it is arbritrary. It far exceeds the exigencies of the occasion and by doing so goes beyond that which has traditionally been regarded by the courts as a constitutional exercise of the police power.
The Mason Act has no significant relation to the health, safety or general welfare of citizens, 'of New York State. The act does *893 not protect the State’s domestic game and wildlife. None of the prohibited crocodylia is indigenous to New York. In its blanket application, banning all species of crocodiles, the Mason Act is too broad and as such, is prohibitive.
A persuasive factor in the effect of the Mason Act is its failure to discriminate between the endangered and unendangered species, which is what the Federal act does and presumably what the Harris Act will do. This type of legislation exceeds the bounds of necessity and is unconstitutionally oppressive.
Precedent for finding that a statute may exceed the exigencies of a situation is found in People v. Gillson (109 N. Y. 389, supra). In that case defendant was convicted of a misdemeanor for offering to his customers the right to choose a piece of crockery if two pounds of coffee were purchased. The Court of Appeals reversed a judgment of conviction and struck down the prohibitory legislation in the following terms (p. 400): “It cannot be truthfully maintained that this legislation does not seriously infringe upon the liberty of the owner or dealer in food products to pursue a lawful calling in a proper manner, or that it does not, to some extent at least, deprive a person of his property by curtailing his power of sale, and unless this infringement and deprivation are reasonably necessary for the common welfare, or may be said to fairly tend in that direction or to that result, the legislation is invalid as plainly violative of the constitutional provision under discussion.”
After reviewing and defining the subject matter of the police power of a State, the court continued (pp. 402-403): “The learned counsel for the People claims that the act is a valid exercise of the police power, in furtherance of the policy of the state to prohibit the setting up of lotteries and the sale of lottery tickets. A careful reading of the statute fails to show any such purpose. It prohibits the seller of food from giving away any other thing as part of the transaction of sale, and as an inducement leading to it. It says nothing as to any lottery, and does not confine its prohibition to the giving away or distribution of any other article of property by virtue of any scheme founded upon chance. The act, in effect, absolutely prohibits the giving away of any other thing with the food sold and as part of the transaction of sale, wholly regardless of the means used to effect the giving away or delivery of such other article. * * * It is further argued, however, that the act is valid as a health law, a regulation of trade in food and to prevent dealing in impure, unwholesome and adulterated food. The same principles apply here as have already been stated, i.e., there must be some fair and reasonable relation of means to end, which courts can see *894 and admit the force of. We think it clear there is no such relation here. We think the act has not the slightest tendency to accomplish the alleged purpose.”
People v. Bums (9 N Y 2d 1, 3-4) was another case where the courts decided the Legislature went beyond that which was within the ambit of its police powers. There, a statute provided that anyone is guilty of a misdemeanor who knowingly sells a magazine from which the cover or title page had been removed. In a unanimous decision the Court of Appeals, declaring the statute unconstitutional, applied this reasoning:
“ Whether the Legislature would have had the competency, in the exercise of the police power,- to pass a law proscribing the illicit traffic in magazines ‘ returned ’ for credit, we need not now consider or decide, for the simple fact is that the statute actually enacted, section 436-d, goes far beyond any such purpose. By absolutely forbidding any person from selling any coverless magazine, regardless of the circumstances under which, or the reasons for which, the cover may have been removed, the Legislature has prohibited unquestionably legitimate sales and rendered criminal conduct that carries not the slightest taint of corruption or impropriety. This it was not privileged to do; its enactment is arbitrary and violative of due process. (See Weaver v. Palmer Bros. Co., 270 U. S. 402; Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537; People v. Estreich, 297 N. Y. 910; People v. Kuc, 272 N. Y. 72; People v. Gillson, 109 N. Y. 389; Matter of Jacobs, 98 N. Y. 98.)
The police power is ‘ very broad and comprehensive ’ and in its exercise 1 the conduct of an individual and the use of property may be regulated so as to interfere, to some extent, with the freedom of the one and the enjoyment of the other ’. (Matter of Jacobs, 98 N. Y. 98, 108 supra.) But, in order for an exercise of the police power to be valid, there must be ‘ some fair, just and reasonable connection ’ between it and the promotion of the health, comfort, safety and welfare of society. (People v. Gillson, 109 N. Y. 389, 401, supra.) 1 The property of a citizen * * * may not be taken from him without rhyme or reason ’ (Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537, 541, supra); a statute may not infringe upon the right of an individual ‘ to pursue a lawful calling in a proper manner, 'or * * * deprive a person of his property by curtailing his power of sale, * * * unless this infringement and deprivation are reasonably necessary for the common welfare ’. (People v. Gillson, 109 N. Y. 389, 400 supra.)
What is wrongful is not the sale of coverless magazines, but rather their sale by a vendor who takes part in a scheme to *895 defraud a magazine publisher. Admittedly, by denominating as criminal all sales, section 436-d necessarily tends to prevent corrupt sales. But, even were we to suppose that it had power to prohibit such corrupt sales, it is unreasonable and beyond the legitimate exercise of the police power for the Legislature to interdict all sales, permissible and illicit alike, in order to prevent those which are illicit. The Legislature may not validly make it a crime to do something which is innocent in itself merely because it is sometimes done improperly, sometimes attended by improper motives or done as part of an illegal scheme.” (See People v. Estreich, 297 N. Y. 910, supra; People v. Kuc, 272 N. Y. 72, supra.)
Since the Mason Act fails to justify its existence as a. valid exercise of the police power ¡and since it does materially interfere with the property rights of plaintiff and the intervenors, it violates the Due Process Clause of the 14th Amendment of the United States 'Constitution, and section 6 of article I of the New York State Constitution. It is unnecessary to pass on the remaining question • whether this legislation violates the Commerce Clause (art. I, § 8, cl. 3) of the United States Constitution.
There being no questions of fact presented by the parties hereto, and the questions of law having been decided herein, judgment is granted declaring section 358-a of the Agriculture and Markets Law unconstitutional.