THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* BENJAMIN J. WEIL and L. VICTOR WEIL, Appellants.

First Department, December 13, 1955.

754

*Samuel I. Rosenman* of counsel (*Godfrey Goldmark, Max Freund* and *Leonard B. Sand* with him on the brief; *Rosenman Goldmark Colin & Kaye,* attorneys), for appellants.

*Anthony Curreri* of counsel (*Seymour B. Quel* with him on the brief; *Peter Campbell Brown, Corporation Counsel,* attorney), for respondent.

*Alexander E. Rosenthal* of counsel (*Irving Segal,* attorney), for Greater New York Taxpayers Association, *amicus curiæ.*

RABIN, J.  This is an appeal from convictions of two landlords charged by information with " the CRIME OF FAILING TO KEEP GAS FIXTURES AND APPLIANCES IN GOOD ORDER AND REPAIR ". The offense alleged, as appears from the trial, is the violation of section 277 of the Sanitary Code of the City of New York by failure to keep in good order and repair a gas refrigerator at an apartment in a building owned by defendants.  Section 277 provides as follows:  " It shall be the duty of every owner, agent, lessee or other person having the management or control of any building or premises to keep all house drains, house sewers, vent pipes, waste and soil pipes, traps and water and gas pipes in such building or premises, and all gas fixtures and gas appliances provided by the owner, agent, lessee or other person having the management or control of such building or premises in good order and repair ".  After trial and convictions at Special Sessions, defendants received suspended sentences.

The material facts may be thus stated: The defendants, highly respected operators in the real estate field for over fifty-five years and without the least blemish on their records, acquired an apartment house building at 176 West 87th Street in 1946.

They employed as manager of the property a man who had been in their service for thirty-seven years. He visited the building once or twice a week. There were eleven employees in the building, including a resident superintendent and a handy man. Most of the seventy-two apartments in the building, including the apartment here involved, 12-D, had gas refrigerators. Defendants provided for the servicing of these refrigerators by contract with the Webster Refrigerator Service for which they paid, annually, a substantial fee. When a tenant notified the superintendent that a refrigerator was not functioning properly, the latter would notify the refrigeration service company to send a serviceman, and, in the meantime, the superintendent would have the refrigerator turned off until the serviceman called. The serviceman would then check and make the necessary adjustments or repairs.

There was testimony that the refrigerator in 12-D was examined by a health department inspector in 1952 and found to be functioning properly; that in February and July of 1953, there were complaints by the tenant in 12-D which were taken care of by the Webster Service. It also appeared that the tenant of 12-D, an elderly man, had refused to furnish a key to his apartment to the superintendent, who had a key to every other apartment, and would not permit building employees access to the apartment in his absence. A locksmith employed by the tenant testified that he had been called to 12-D on September 25, 1953, to repair a lock. He testified that the windows in the two rooms which he was able to observe were closed and that there was a strong odor from the refrigerator; conditions were such that his eyes were smarting; he told the tenant that his refrigerator needed cleaning and scraping, whereupon the tenant replied that he would take care of it the following week when his maid would be there. Defendants had no knowledge of this since the tenant made no complaint or report. On the following day, September 26, 1953, the tenant of 12-D died, apparently of carbon monoxide poisoning.

An inspection of the refrigerator then revealed, according to the testimony of a health department inspector, that as a result of improper functioning, carbon monoxide was coming from the refrigerator. Between July, 1953, the last date of service on the refrigerator, and September 26, 1953, neither the owners nor any of their agents or employees had notice of any trouble or complaint with respect to the refrigerator in 12-D. The prosecution concedes the absence of either actual or constructive notice to defendants, and argues none was necessary. No proof of

notice, either actual or constructive, was introduced by the prosecution at the trial.

The majority of the trial court concluded that, under section 277, notice was not a necessary component of the prosecution's case; proof of the defective condition of the refrigerator imposed upon the defendants the burden to show they had used reasonable care in the maintenance of the appliance; and the defendants had failed to meet the stated burden. Since we disagree with the premise that convictions can be had under section 277 where defendants had no notice or knowledge of the allegedly defective refrigerator, we would reverse on that ground apart from any other considerations.

The board of health of the City of New York is invested with the power, extraordinary as to administrative agencies, to formulate standards as well as to issue orders enforcible by penal sanctions. (Penal Law, § 1740; New York City Charter, § 558.) Indeed, subdivision b of section 558 of the city charter goes so far as to authorize the board of health to prescribe " fines, penalties, forfeitures and imprisonment " in the Sanitary Code for the enforcement of that code or the board's order; and, accordingly, section 224 of the Sanitary Code makes provision for punishment for its violation (see, also, Administrative Code, § 564–6.0). The Sanitary Code may, therefore, " be taken to be a body of administrative provisions sanctioned by a time-honored exception to the principle that there is to be no transfer of the authority of the Legislature." (*People* v. *Blanchard,* 288 N. Y. 145, 147.)

Whatever standards of measurement of meaning may be applicable to ordinary legislation, we are entitled to expect the most precise and knowledgeable expression of purpose and intent when, as here, the legislating body is one familiar with and highly expert in the subject matter of the legislation. Since criminal statutes — and as here enforced, section 277 must be treated as such — are, of course, ordinarily to be strictly construed (*People* v. *Shakun,* 251 N. Y. 107), we would therefore apply the foregoing rule of strict construction with particular rigor in reading section 277. When so read, it does not sustain the judgments of conviction.

The board of health could have prohibited entirely the use of gas refrigerators as dangerous to the public health; it chose not to do so. Alternatively, the board could have ordered regular and periodic inspections of such appliances by building owners (see, e.g., Sanitary Code, §§ 13, 21, 172); no such provision was made. Instead, in 1951, section 277, which had previ-

ously referred generally to the maintenance of plumbing and gas pipes without any mention of gas appliances, was amended to specify that an owner was obliged to maintain " in good order and repair " — " all gas fixtures and gas appliances provided by the owner ". Notwithstanding the plenitude of power granted the department of health to meet the notorious threat to life and health caused by the fatally noxious gases which could be emitted by a faulty gas refrigerator, the foregoing provision, and no other, was adopted.

The 1951 amendment to section 277, attributable to an agency familiar with health problems in housing, must be presumed to have been drafted with full knowledge of the experience under cognate section 78 of the Multiple Dwelling Law. It is there provided, in language substantially like that in section 277 of the Sanitary Code, that the owner of a multiple dwelling has the duty to keep " every part thereof * * * in good repair ". For many years preceding 1951 the settled meaning of this statute has been that notice or knowledge on the part of the owner is a condition of civil liability for injury caused by some defect (*Altz* v. *Leiberson*, 233 N. Y. 16; *Collins* v. *Noss*, 258 App. Div. 101, affd. 283 N. Y. 595; *Becker* v. *Manufacturers Trust Co.*, 262 App. Div. 525) — including cases involving defective refrigerators (*Phillips* v. *Mutual Life Ins. Co.*, 20 N. Y. S. 2d 609). If it was intended by section 277 to predicate criminal liability on a lesser awareness or a lesser degree of negligence than that understood to be prescribed by section 78 of the Multiple Dwelling Law for civil liability, the intention was unstated.

The prosecution, however, urges reliance upon the absence in section 277 of any requirement of notice, and cites various instances where offenses considered mala prohibita were sustained without proof of knowledge or notice. (*People* v. *Kibler*, 106 N. Y. 321; *People* v. *Swift & Co.*, 286 N. Y. 64.) Because of the influence that the language and history of section 78 of the Multiple Dwelling Law have on our reading of section 277 of the Sanitary Code, we consider the absence of express reference to notice in the later provision as inconsequential as it is in the earlier statute. We do not thereby intend to fix the meaning of section 277 for all purposes. Section 277 is the basis for various administrative and civil actions, as well as for the criminal penalties imposed by separate provision. " These penal consequences * * * do not of necessity affect the meaning that [section 277] * * * would have without them. The scope of the duty is one problem; the extent to which the breach may be visited with punishment, another." (*People*

*ex rel. Price* v. *Sheffield Farms Co.*, 225 N. Y. 25, 29.) It is only in its criminal impact that we are convinced that if section 277 had intended to constitute the owner an absolute guarantor, at the risk of jail and fine, of the condition of his gas refrigerators, it could have contained language sufficient to that end. Such language is not to be found in section 277 of the Sanitary Code, and we are not at liberty to supply that which expert cognizance omitted and can still supply. Any other construction of section 277 would immediately raise those serious constitutional issues provoked when, for some adequate public purpose, criminal penalties are imposed without regard for actual or implied evil intent (see Sayre on Public Welfare Offenses, 33 Col. L. Rev. 55). We think it unwise to raise such issues where they are not unavoidably posed. We, therefore, take the view that section 277 will not sustain the convictions of defendants who concededly had no notice or knowledge of the defective condition charged.

To hold otherwise would mean that an owner of a building could be cast in criminal liability, if within ten minutes after he had installed a new refrigerator in perfect working order, a defect developed, though that defect were caused by an act of the tenant. Such a construction would lead to unconscionable and unjust results. Judge FULD in *Kauffman & Sons Saddlery Co.* v. *Miller* (298 N. Y. 38, 44) (although not construing a statute penal in nature) used the following language which might very well be applied to this case: '' To read the provision otherwise, to construe it as rendering the landlord responsible even though he acted properly and in good faith throughout, would be to attribute to the Legislature an intent to accomplish a most unjust and unreasonable result.  *  *  * We  *  *  * reject an interpretation of its words which would so clearly offend against common sense. Where the language of a statute is susceptible of two constructions, the courts will adopt that which avoids injustice, hardship, constitutional doubts or other objectionable results.''

But entirely apart from the issue with respect to notice, it would seem on the facts of this case that the landlords did not have the control of the premises contemplated by section 277. The duty imposed by that section is placed upon '' every owner, agent, lessee or other person having the management or control of any building or premises.'' Since the tenant of apartment 12-D refused to give a key to the superintendent, although all other tenants did, and refused to permit any employee of the defendants to enter his apartment, except by special arrangement, the control of apartment 12-D would seem to have been

with the tenant rather than the landlords. Thus if any emergency arose requiring immediate access to the tenant's apartment, the landlords would have been prevented from entering in order to meet the emergency. This lack of access to the tenant's apartment, we think, compels a finding that the landlords did not have the control specified in section 277. On the evidence, therefore, defendants should not be held for a violation of the section.

We conclude that, both on the law and the facts, the judgments appealed from should be reversed and the information dismissed.

BREITEL, J. P., BASTOW, BOTEIN and BERGAN, JJ., concur.

Judgments unanimously reversed and the information dismissed.