Jacob Maekowitz, J.
In this action, the court is called upon to decide the constitutionality of section 181.15 of the New York City Health Code which makes it “ unlawful for any person to tattoo a human being,” with the exception that “ tattooing may be performed for medical purposes by a person licensed or otherwise authorized * * * to practice medicine or osteopathy. ”
Until the challenged provision of the Health Code became effective in November, 1961, each of the plaintiffs operated a *222 tattoo establishment in Coney Island, New York. Prohibited by section 181.15 from exercising their calling, they brought this action to declare it unconstitutional.
Section 181.15 of the Health Code was adopted by the New York City Board of Health on October 2, 1961, pursuant to the power vested in the board by section 558 of the New York City Charter. The latter section provides, in pertinent part, that “ The board of health is hereby authorized and empowered * * * to alter, amend or repeal any part of the health code, and may therein publish additional provisions for the security of life and health in the city ”.
The evidence adduced at trial shows that, early in 1959, the Health Department’s Bureau of Preventable Diseases began to suspect a relationship between serum hepatitis and tattooing under unsterile conditions. Hepatitis is a serious, sometimes fatal, disease of the liver, for which there is no known cure and no known method of immunization. One means of its transmission is through the blood stream and unsterile tattooing procedures can, without doubt, be a source of infection.
In March, 1959, the Board of Health adopted section 181.15 of the Health Code, labeled “ Tattooing Establishments ”, which was designed to insure sanitary and sterile procedures in tattooing establishments. Among other things, the board required that dye solutions used in tattooing be sterilized, that instruments be sterilized, that “ tattooing procedures be carried out in a clean, safe and sanitary manner so as to minimize danger of infection ’ ’ and that ‘ ‘ the tattooing establishment be maintained in a clean and sanitary manner ’ ’.
After the promulgation of these regulations, the board summoned some tattoo parlor operators to meet with Assistant Commissioner Jerome Trichter. The Commissioner urged them to voluntarily close their shops and to engage a bacteriologist or other professional consultant to advise them as to proper tattooing procedures so as “ to be sure that there was no hazard in the operation.” The operators complied with this request from Commissioner Trichter and, after presenting their consultant’s recommendations to the Commissioner and agreeing to abide by them, the shops were permitted to be reopened subject to Department of Health surveillance.
In 1961, Dr. Fuerst, Director of the Department’s Bureau of Preventable Diseases, reported a rise in the incidence of serum hepatitis attributed to tattooing under unsterile conditions in tattooing parlors. Thereafter, at a meeting of the Board of Health on September 5,1961, Commissioner Trichter stated that
*223 tattooing “ served no useful purpose ” and proposed its prohibition. Significantly, however, even he recognized that 11 One of the six [tattooists in New York City] is doing a good job of sterilizing the needles that are used to pierce the skin.” He further indicated that he thought some tattooing was performed by dermatologists and that, since tattooing under sterile conditions presented no hazard with regard to the spread of serum hepatitis, tattooing by physicians should be permitted. However, the minutes of this meeting disclose apprehension that permission for one group, i.e., physicians, to perform tattooing under sterile conditions might invalidate the proposed prohibition on the ground of arbitrary discrimination. Therefore, it was concluded that all tattooing, except that performed by a physician for medical purposes, should be banned. Final action was postponed, however, in order to give known operators notice and an opportunity to be heard.
The board next met in October, 1961, with eight tattoo operators present, six of them represented by counsel. After hearing the views of its own staff and its consultants, and after hearing the views of the tattoo operators, the board repealed the former 181.15 and adopted a new section 181.15 whose constitutionality is here in issue.
This court must now determine, as in every case involving the restraint of an individual by an administrative agency, whether the prohibition reasonably serves to protect those social interests which may be vindicated by the police power of the State, and whether there exists a rational relationship between the restriction, prohibition of tattooing except by a physician for medical purposes, and the substantive evil, the transmission of serum hepatitis by tattooing under unsterile conditions.
It is uncontested that the police power of the State is “ very broad and comprehensive ” and that “ Under it the conduct of an individual and the use of property may be regulated so as to interfere, to some extent, with the freedom of the one and the enjoyment of the other” (Matter of Jacobs, 98 N. Y. 98, 108; see, also, Queenside Hills Realty Co. v. Saxl, 328 U. S. 80, 83; Nebbia v. New York, 291 U. S. 502, 527-528; Murphy v. California, 225 U. S. 623, 628-629; Jacobson v. Massachusetts, 197 U. S. 11, 26).
The exercise of the police power by an administrative agency, no less than by the Legislature itself, however, is subject to restraint by means of judicial review. 11 The property of a citizen * ° * may not be taken from him without rhyme or reason.” (Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537, 541.) Even though an administrative agency is vested with *224 the police power, it may not infringe upon the right of an individual “to pursue a lawful calling in a proper manner, or * * * deprive a person of his property by curtailing his power of sale, * * * unless this infringement and deprivation are reasonably necessary for the common welfare ” (People v. Gillson, 109 N. Y. 389, 400).
For the purposes of this decision, it may be conceded that section 181.15 was adopted pursuant to a valid grant of authority contained in section 558 of the New York City Charter. Although this delegation of power to amend the Health Code is broad in scope, the standard prescribed — “ the security of life and health in the city ”— appears sufficient to bring the delegation within permissible limits (Chiropractic Assn. of N. Y. v. Hilleboe, 12 N Y 2d 109; Matter of City of Utica v. Water Pollution Control Bd., 5 N Y 2d 164, 168-169; People v. Weil, 286 App. Div. 753).
This court recognizes that such mandate encompasses within its purview the authority to protect those within its limited' regulatory ambit from the transmission of serum hepatitis by tattooing under unsterile conditions. The issue of whether there was a valid delegation of power in this case is different, however, from the issue of whether there was a valid exercise of the delegated power. “A statute entitled a health law must be a health law in fact as well as in name, and must not attempt in the name of the police power to effect a purpose having no adequate connection with the common good ” (Matter of Viemeister v. White, 179 N. Y. 235, 238, quoted with favor in Loblaw, Inc., v. New York State Bd. of Pharmacy, 11 N Y 2d 102, 107).
Examination of the record before this court leads to the inexorable conclusion, that the all-encompassing scope of section 181.15 infringes upon the freedom of the individual in areas which bear no reasonable relation to the protection of the public health against the contagion of serum hepatitis. The minutes of the September 5, 1961 meetings reveal that tattooing per se was not considered dangerous by the board.
At the trial, all of defendant’s expert witnesses testified that tattooing could be performed in a manner that presented no health problem with regard to serum hepatitis. Dr. Fuerst, Director of the Bureau of Preventable Diseases, -stated that “ I would say that if a period of formal training were required and candidates for this industry who pass this period of training were required to pass examination indicating their understanding of the principles of bacteriology, of sterilization, of asepsis, and if they further demonstrated their proficiency in the tattooing process itself, then under these circumstances I tliinb that the answer would be that the industry is regulatable. ” *225 Other testimony from defendant’s witnesses substantiated this view. Dr. Langmuir, Chief of the Epidemiology Branch of the Communicable Disease Center of the United States Public Health Service, testified in answer to whether it is possible for a lay person to be reasonably expected to be able to maintain a sterile field: “ Oh, certainly. The world is full of examples, I think, of non-medical persons who have learned to do this and do it competently. Nurses in doctors’ offices do this with great skill. Operating room nurses, for instance, do this every day. And technicians in laboratories, technicians in blood banks, remove blood from patients. Take large volumes of blood. In the Army, varieties of Medical Corps men are actively doing this type of procedure. They have been trained and they do it, I think with consummate good skill.”
Furthermore, there was evidence that tattooing machines and equipment can be entirely sterilized.
The record is strikingly barren of any evidence or indeed of any contention by either the Board of Health or its expert witnesses that tattooing per se is dangerous or that tattooing performed in a sterile field poses a public health problem. What the record does manifest is a finding by the Board of Health of a relationship between tattooing under unsterile conditions in tattooing parlors and serum hepatitis. However, the minutes of the Board of Health unequivocally indicate that the subject of tattooing, the art so cavalierly banned, and the possible effect upon physicians and individuals by an unduly restrictive prohibition were never explored. Particularly is this significant when we consider the origin, history and uses of tattooing.
The origins of the art of tattooing have been traced by positive archaeological evidence to predynastie Egypt of the fourth millennium B. C. (See, Hambly, The History of Tattooing and Its Significance [1927].) Besides the religious significance of tattooing, which has been amply documented by Dr. Hambly, defense testimony at trial also pointed out the utilitarian function of tattooing for identification purposes. Thus, for instance, during World War II, countless civilians as well as servicemen, fearing the loss of other means of identification, requested that they be tattooed to reveal their blood type or religious affiliation. (See, e.g., Burchett and Leighton, Memoirs of a Tattooist [1958].)
Testimony before this court referred to the use of tattooing to remove a tattoo. Dr. Costello, a noted dermatologist indicated that he had personally engaged in such procedures. His testimony pertained to the removal of voluntarily obtained tattoos. Such removal may not necessarily be a tattooing “ for medical *226 purposes.” Nor would removal by tattooing of an involuntarily inflicted tattoo — -whether the number of a Nazi concentration camp victim or other involuntarily inflicted tattoo — necessarily be a tattooing “ for medical purposes.”
And in those borderline instances in which the psychological effect on the individual might not warrant classification as “ for medical purposes,” who could blame the licensed physician who prudently feared transgressing the “permissible” limits of section 181.15?
Indeed, the very standard for “medical purposes ” in the context of a large part of the tattooing performed by physicians raises the serious question of whether the section, the violation of which constitutes a misdemeanor, is not void for vagueness (People v. Munoz, 9 N Y 2d 51 and cases cited therein). There can be no equivocation that tattooing for identification of blood type, tattooing to identify one as a diabetic, tattooing to inject medicine and tattooing to treat recalcitrant sldn disorders would be classified as tattooing for medical purposes. But a great deal of the tattooing performed in conjunction with plastic surgery defies automatic classification and falls within a troublesome penumbra. (D. N. Matthews, O. B. E., M. Ch., F. R. 0. S., “ Technique and Value of Tattooing in Plastic Surgery”, Proceedings of the Royal Society of Medicine, Vol. XL, 881 [1947]; Cyril J. Poison, M. D., F. R. C. P., “ Tattooing ”, XVI Medico-Legal Journal [1948].) Furthermore, because of the highly technical skill necessary in tattooing as an adjunct to plastic surgery, physicians often require the assistance of tattoo artists. For this reason both Dr. Poison and Sir Harold Gillies, F, R. 0. S,, employed the services of the noted tattooist, George Burchett, in their medical practice.
Under the restrictions of section 181.15, a physician may not utilize the superior skill of a tattooist to tattoo a patient even if performed under the supervisory scrutiny and responsibility of the doctor and even if the tattooing was clearly ‘! for medical purposes.”
The tattooing which the board clearly intended to prohibit is tattooing for ornamentation. Although such tattooing is looked upon askance by many —- one defense witness even suggested tattooing was sought “ for a variety of abnormal motivations ” — the fact is that many respectable, even renowned, individuals are tattooed. Thus, Lady Randolph Churchill, the American-born mother of Sir Winston Churchill, was tattooed for ornamental purposes, as was King Frederick IX of Denmark, King George V, Edward VII, Alfonso XII of Spain, and Viscount Montgomery of Alamein, as well as countless other distinguished *227 members of society (United Mainliner, Yol. 6, No. 6, June, 1963). Yet, pursuant to section 181.15, a doctor willing and able artistically to tattoo or a tattoo artist trained in the technique of sterilization could not tattoo an individual who desired an ornamental mark.
Under specialized and limited circumstances, the police power is broad enough to encompass the prohibition of an art, business or calling. But it cannot be gainsaid that in a society like ours, where individual enterprise is of the essence of constitutionally protected liberty, we must look with especial care at any enactment, whether legislative or administrative, which prohibits the exercise of an otherwise lawful calling. Certainly, prohibition of an activity should not be upheld where regulation of it would serve the same public good. (Good Humor Corp. v. City of New York, 290 N. Y. 312; Trio Distr. Corp. v. City of Albany, 2 N Y 2d 690.)
The evidence also shows that the Health Department abandoned its previously adopted regulation of tattooing, in favor of prohibition, without ever having actually enforced this regulation by fine or criminal penalty; although they inspected tattooing premises and gave warnings — never to the two plaintiffs herein, however — they never attempted or exercised their purported power under statute to exact either a criminal or civil penalty. (See N. Y. City Charter, § 558, subd. d.) The fact is that the plaintiffs heroin are prohibited from exercising their legitimate calling even though they were never found to have violated the board’s previously existing regulations and even though they exhibit every willingness and ability to perform their work without creating a public health hazard.
Moreover, although the record fails to justify its conduct, the board concluded that regulation could not cope with the public health problem presented, without even trying more stringent form of regulation than that they originally adopted. It is all too easy for an administrative agency to justify prohibition on the ground that regulation is not ‘ ‘ feasible ’ ’ when, in fact, the agency’s own inadequate enforcement of the regulation is what makes it unfeasible. This form of administrative “ boot strapping ” can hardly justify the prohibition of a lawful calling. (Good Rumor Corp. v. City of New York, supra.)
Even had there been a rational basis for abandoning regulation in favor of prohibition, the form of the prohibition undertaken in section 181.15 is violative of due process. The section not only prohibits unsanitary and unsterile tattooing, but goes further and prohibits any tattooing whatsoever, however sterile and safe in terms of the public health, unless it be done for *228 medical purposes. An activity which is innocent in itself may not be validly prohibited merely because, under some conditions, it is attended by danger to public health. (People v. Munoz, 9 N Y 2d 51, 55, supra; People v. Bunis, 9 N Y 2d 1, 3; People v. Kuc, 272 N. Y. 72; People v. Estreich, 297 N. Y. 910.)
The same principle which invalidated the statutes in the Kuc, Estreich, Munoz and Bunis cases invalidates section 181.15. The section concerned prohibits all tattooing, sanitary as well as unsanitary. Such an over-all prohibition to cover dangerous and harmless tattooing indiscriminately is as unreasonable as was the prohibition of all sales of newspapers after 9:00 p.m. in the Kuc case, or the punishment of any receipt of stolen goods in the Estreich case, or the carrying of sharp-pointed instruments in public places in the Munoz case, or the sale of all coverless magazines in the Bunis case.
Had defendant done more than attempt to give effect to a preconceived notion that tattooing “ serves no useful purpose,” it would scarcely have attempted to prohibit outright and entirely an activity which testimony before this court and our own research demonstrates beyond cavil, is a useful and desired art both to the individual involved and as an adjunct to medical science and may be performed in a manner that presents no health problem with respect to serum hepatitis.
In addition to the above objections section 181.15 raises the serious legal question of pre-emption. The State laws contain implicit acceptance of tattooing. Section 483-c of the Penal Law prohibits only the tattooing of any child under the age of 16 years; section 1030 of the Penal Law prohibits only the tattooing of any individual in connection with hazing.
This court has profound respect and admiration for the formidable responsibility of the Board of Health and the manner in which it has protected those within its care from hazards to health. However, the exercise of such extraordinary power, particularly by a nonelective administrative agency must always be carefully scrutinized lest it be abused. An enactment as the one under discussion, which punishes innocent and guilty alike, which treats the man who would and can avoid risk to the public just like the man who would not and could not prevent such a risk, is unreasonable and cannot stand. If there be some who find judicial concern to vindicate the right of a tattoo artist misplaced, it is only necessary to remind them that the rights of all of us are only as secure as those of the most humble and lowly among us.
It is the duty of the courts to view any curtailment of freedom in the framework of the concept of the individual and of the *229 society in a democracy. While we do not question that its motives were laudatory, the Board of Health, in this instance, has promulgated ‘ ‘ a broad enactment designed to meet a limited though serious evil”, and thereby has exceeded the permissible exercise of that portion of the police power delegated to it (People v. Munoz, 9 N Y 2d 51, 55, supra).
We hold that the present section 181.15, for the reasons above stated among others, is unconstitutional and void. The parties have waived findings of fact and conclusions of law. The foregoing constitutes the decision of the court. Plaintiffs are entitled to the injunctive relief requested.